[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION AND JUDGMENT ENTRY
* * * * *
This appeal comes to us from the Lucas County Court of Common Pleas. There, appellant was found guilty of murder and attempted murder following the return of a jury's verdict. Because we conclude that appellant was not prejudiced by various court rulings, we affirm.
On June 20, 1996, appellant, Kevin L. Williams, was indicted on two counts: murder with a firearm specification, in violation of R.C. 2903.02, 2929.71, and 2941.141; and attempted murder with a firearm specification, in violation of R.C. 2923.02. The charges stemmed from appellant's alleged fatal shooting of Corey Denzmore and wounding of Michael Gray on the night of May 23, 1996.
Appellant pled not guilty and moved to suppress a photo array identification conducted by police. After conducting a hearing, the trial court denied appellant's motion to suppress.
On October 1, 1996, a jury trial commenced.
At trial, Michael Gray (the surviving victim) testified that on the evening of May 23, 1996, he and some friends, Corey Denzmore, Derrick Jackson, and Jason Porter, were gathered together at the residence of Michael Burwell. Gray stated that at about 11:00 p.m. Michael Smith pulled up to the Burwell home in a white van and approached Gray who was sitting on the porch. Gray recognized Smith as someone who had tried to rob him previously and a fistfight ensued. After several minutes of fighting, Smith ran off. Gray then walked over to the van, removed the key, and threw it down the sewer.
Gray further testified that approximately twenty minutes later from inside the house he saw a "`69 Bonneville" car back into the driveway. Three people were standing outside the car near the trunk; another person was "fumbling around" in the van. He and Corey Denzmore walked out into the front yard. According to Gray, appellant approached him and asked three times where the keys to the van were. Twice Gray told him he didn't know; finally, Gray said he had thrown them in the sewer.
Gray testified that appellant then drew a large, black pistol from behind his back, stuck it in Gray's face, and pulled the trigger. Gray fell backwards to the ground, wounded in the jaw, but still conscious. Gray testified that, with appellant still standing nearby, he heard three or four more gunshots and appellant's voice saying, "This is Blood." Gray said that all the shots sounded like they came from the same gun. Gray said that appellant and the person in the van got back into the car with the others; all then left. Gray testified he then heard different gunshots, farther away.
Police and emergency medical personnel arrived on the scene shortly thereafter. Corey Denzmore had been shot once in the chest and twice at closer range in the head; he was pronounced dead at the scene. Gray was taken to the hospital and placed in the intensive care/trauma unit.
Two days after the shooting, at approximately 11:00 a.m., Detective Richard Molnar interviewed Gray in the hospital. Because of the severe injury to his jaw, Gray communicated only by writing. Gray was first shown three photo arrays without appellant's picture. He specifically indicated that the shooter was not among the photos, but pointed to Smith's photo, stating that Smith was the "cause" of the shooting.
Gray then told the detective that the shooter was a man known by the street name of "Smurf." Molnar returned to the hospital at 2:00 p.m. that same day with three more photo arrays. Viewing the first array, Gray immediately pointed out the photo of appellant and identified him as the shooter.
At trial, Gray said that at the time of the shooting he recognized appellant immediately as someone he knew and had seen more than twenty times over the previous four years. Gray further testified that appellant had been only three feet from him, spoke directly to him for over one minute prior to the shooting, and was illuminated by the streetlight located approximately ten feet away. Gray stated that he was certain that appellant was the person who had shot him.
Another witness, Derrick Jackson, corroborated Gray's testimony of the events leading up to the shooting. Jackson stated that after Gray went outside, Jackson went to the front door, heard shots and saw Gray, who had his back to the house, fall to the ground. Jackson said that he saw two other people near Gray. One person was facing Gray; Michael Smith, the other person, was standing next to that person.
According to Jackson, after Gray fell, Smith turned and ran to the car. However, the person who had been standing directly in front of Gray then turned and shot Denzmore who fell to the ground. Jackson stated that this same person then walked over to Denzmore, shot him in the head, and said, "This is Blood." Jackson said he did not actually see the men's faces, the gun, or exactly who had shot Gray or Denzmore. However, Jackson said he saw a "muzzle flash" by the second man as Denzmore was shot. The shooter then walked quickly back to the car. Jackson also stated that he heard only one gun in relation ship to the gunshots which struck both victims.
Jackson admitted that on the day after the shooting, he told police he assumed Michael Smith had shot Gray and Denzmore because of the fight and because Smith was standing next to Gray and then fled after the first shot was fired. Jackson acknowledged that he had originally given descriptions to police which matched Smith, rather than appellant.[1] However, Jackson said that he did so based on his own assumption that Smith had been the shooter rather than on actually seeing him shoot. At trial, Jackson described the man who stood directly in front of Gray and then shot Denzmore as "about six feet, probably about 180 [pounds], black." Jackson further stated that this man was not Michael Smith.
Police investigating the crime scene found four .40 caliber shell casings near the two victims' bodies. Two projectiles were dug from the ground area which had been directly beneath Denzmore's head. Several .9 millimeter shell casings were also found farther away in the street under the van. A police criminalist testified that all four .40 caliber casings were fired from the same gun and that the projectiles found under Denzmore's head were also from .40 caliber bullets.
The deputy coroner testified that the bullet wounds caused the death of Denzmore. She also testified that the gunshot wounds on Denzmore's head were inflicted from a distance of six to eighteen inches. Gray's medical records and documentation of his injuries from the gunshot wound were stipulated to by the parties.
Finally, Detective Richard Molnar testified as to Gray's photo identification and to statements made by appellant regarding the shooting. Appellant was arrested on June 11, 1996 and first interviewed by Molnar from approximately 6:00 a. m. to 9:00 a.m. Appellant was Mirandized prior to this interview and subsequent interviews. When first questioned, appellant said that on the night of the shooting, Smith had come to appellant's ex-girlfriend's house after the fight with Gray to get help from appellant and his friends. After talking with Smith, appellant told Molnar that Jay Bush, "Junior", Tyrone, and "Tony Hutchin son"[2] left in two cars. Appellant said he stayed behind and did not go to the scene of the shooting. Appellant then stated that Smith had told him about the shooting on the next morning. However, when Molnar indicated to him that this was not possible because Smith had been in police custody, appellant said he had heard it from "Junior" and Bush who had brought over a newspaper article.
Detective Molnar then broke off the interview, but resumed later that morning at 11:30. Appellant then changed his statement, admitting that he had ridden along in one of the cars with "Junior" and Bush. Smith, Tyrone, and "Hutchinson" had driven to Burwell's house in a Bonneville. After arriving at Burwell's house, appellant said that he and Bush stayed in the car while the others got out to confront Gray. Appellant said Tyrone and "Hutchinson" approached Gray, but that "Junior" had used Bush's .9 millimeter handgun to shoot both Gray and Denzmore. After the shooting, the men all ran back to the cars and left.
Detective Molnar testified that on June 16, 1996, he again conducted another interview at appellant's own request. This time, appellant said that he had exited the vehicle along with "Junior." Appellant said he approached and spoke to Gray, who told him he had thrown the van key in the sewer. Appellant said he saw Denzmore reach behind his back and Gray reach for his hip. Appellant then said "Hutchinson" had shot Gray from the driveway, using a "40 Glock" handgun.
Appellant then told Molnar that after Hutchinson shot Gray, "Junior" shot Denzmore from about eight feet away using the .9 millimeter handgun. They all then left in the cars, firing more shots as they went by the crime scene. After the interview, as appellant was being transported back to jail, Molnar stated that appellant spoke again saying, "Rick, hypothetically speaking, if I told you I shot the Dude, I'm still going to get eight to 25, how can you help me?" Molnar indicated he would tell the prosecutor that appellant had cooperated with the investigation.
On July 2, 1996, appellant again requested to talk with Molnar. Molnar said that although appellant appeared at first to want to talk about the shooting, he ultimately refused to make any further statements.
The state then rested. Appellant offered no evidence or testimony in his own defense. The jury returned verdicts of guilty as to both Count One, murder with firearm specifications and Count Two, attempted murder with firearm specifications. As to Count One, appellant was sentenced to fifteen years to life with an actual incarceration of three years as to the firearm specification. As to Count Two, appellant was sentenced to a term of ten to twenty-five years to be served concurrently with three years actual incarceration as to the firearm specification. Counts One and Two are to be served consecutively to each other and to the firearm specification attached to Count One.
Appellant now appeals that conviction, setting forth the following six assignments of error:
 "I. THE TRIAL [SIC] ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE DISCRIMINATORY USE OF THE PROSECUTION'S PEREMPTORY CHAL LENGE.
 "II. THE PRETRIAL IDENTIFICATION PROCEDURE WAS SO UNNECESSARILY SUGGESTIVE AS TO VIOLATE DUE PROCESS AND SO INFLUENCED THE IN COURT IDENTIFICATIONS THAT IT WAS ERROR TO ADMIT THEM.
 "III. THE FAILURE TO CHARGE THE JURY WITH THE INSTRUCTION FOR FELONIOUS ASSAULT WAS ERROR.
 "IV. THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 "V. THE COMMENTS MADE BY THE PROSECUTOR IN HIS CLOSING STATEMENT WERE BOTH PREJUDICIAL.
 "VI. THE TRIAL JUDGE ABUSED HIS DISCRETION AND VIOLATED THE APPELLANT'S RIGHT TO DUE PROCESS OF LAW, PURSUANT TO THE CONSTITUTION [SIC] OF THE UNITED STATES OF AMERICA AND STATE OF OHIO."
 I.
Appellant, in his first assignment of error, claims that the trial court erred in overruling his challenge to the prosecution's use of a peremptory challenge to remove an African-American juror.
To establish purposeful discrimination in excluding members of a jury based on race, a defendant must first show that he is a member of a "cognizable racial group" and that the prosecutor has exercised peremptory challenges to remove from the jury members of the defendant's race. State v. Hernandez (1992),63 Ohio St.3d 577, 581-582, citing Batson v. Kentucky (1986),476 U.S. 79. The second prong of Batson allows the presumption that peremptory challenges may sometimes be used as a way to discriminate. Id. at 582. Finally, the defendant must show that from the facts or circumstances, an inference can be raised that the prosecution used peremptory challenges to exclude members of the jury because of their race. Id.
After the defendant has established a prima facie
showing of discrimination, the state must put forth a neutral explanation for challenging the excluded jurors. Id. The prosecutor's explanation need not meet the same level as that required for challenge for cause. Id. The state must only provide a neutral explanation related to the particular case to be tried.Id. The trial court's decision that the "state did not possess discriminatory intent in the exercise of its peremptory challenges will not be reversed on appeal absent a determination that it was clearly erroneous." Id. at 583.
In this case, after a complete review of the record, we conclude that nothing in the record indicates that the state exercised its peremptory challenge with the necessary discriminatory intent required by Batson. Although appellee challenged a female juror who happened to be African-American, three other African-American jurors remained as members of the panel. More-over, at the trial court's request, the prosecution gave several reasons for the challenge. Although the juror lived about one mile from the crime scene, when asked if she was familiar with that area of the city, she was evasive and then denied knowing the area. Additionally, she had previously served as a juror on a drug case in which the result was a hung jury. Finally, the state noted that the juror's demeanor and physical mannerisms during voir dire had been "disinterested and hostile toward the State." Therefore, since we conclude that the state provided valid neutral reasons which are consistent with the record, we cannot say the trial court's ruling was clearly erroneous.
Accordingly, appellant's first assignment of error is not well-taken.
 II.
Appellant, in his second assignment of error, argues that the trial court erred in admitting Michael Gray's in-court identification of appellant. Appellant claims the in-court identification was violative of his due process rights, because it was allegedly based upon "unnecessarily suggestive" pretrial identification procedures.
The admission or exclusion of evidence is generally left to the discretion of the trial court. State v. Hymore 1967),9 Ohio St.2d 122, 128. An in-court identification subsequent to a pretrial photographic identification will be set aside only if the photographic identification procedure was so impermissibly suggestive so as to create "a very substantial likelihood of irreparable misidentification [citation omitted]." State v.Barnett (1990), 67 Ohio App.3d 760, 768; State v. Hill (1987),37 Ohio App.3d 10, 14. "Reliability is the linchpin" in determining the admissibility of identification testimony. Hill, supra, citing to Manson v. Braithwaite (1977), 432 U.S. 98, 114.
The U.S. Supreme Court established the following five factors which affect the reliability of an identification:
 "`the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. * * *' Neil v. Biggers (1972), 409 U.S. 188, 199-200. See also, Manson, supra
at 114-116." Hill, supra, at 14.
Even though an identification procedure may have included some suggestibility, this factor does not, per se, preclude admission of the identification. State v. Moody (1978), 55 Ohio St.2d 64,67; Barnett, supra, at 767; State v. Merrill (1984), 22 Ohio App.3d 119,121.
Applying these guidelines to the present case, we conclude that the photo array and subsequent in court identification of appellant were not unduly suggestive or unreliable. First, the photo array contains six computer generated photo graphs of black males with slight variances in facial characteristics. Height, weight, or overall build is not discernible from the photos. Four of the pictures, including appellant's, depict men with a medium skin tone. In all the pictures, the men wear fairly short haircuts. Other facial features vary, including facial hair, but are not so distinctive so as to draw immediate attention to appellant's picture. Therefore, we cannot say that the photo array itself is overly suggestive or prejudicial to appellant.
Second, we cannot say that the method in which Gray was shown the photos was unduly suggestive or that Gray's identification was otherwise unreliable. It was Gray who first identified the shooter as a man with the street name of "Smurf." From prior dealings, Detective Molnar knew appellant called himself "Smurf." This resulted in Molnar's placing appellant's picture in the second photo array. When shown this second array, appellant immediately identified appellant as the shooter. We can find nothing in the record which suggests that anyone prompted Gray or singled out appellant's picture.
More importantly, Gray's identification was based on his own face-to-face encounter with appellant. Gray was certain of the photo identification which was made only two days after the shooting. Therefore, we conclude that the trial court did not abuse its discretion in denying appellant's motion to sup press the photo array and ensuing in court identification.
Accordingly, appellant's second assignment of error is not well-taken.
 III.
Appellant, in his third assignment of error, contends that the trial court erred in refusing to instruct the jury as to the lesser included crime of felonious assault.
While we are aware that some districts have held otherwise, we have previously determined that, pursuant to the test espoused in State v.Deem (1988), 40 Ohio St.3d 205, felonious assault is not a lesser included offense of attempted murder or murder. See State v. Hall
(May 17, 1996), Sandusky App. No. S-95-032, unreported. Therefore, since appellant was indicted on murder and attempted murder, he was not entitled to an instruction on felonious assault.
Furthermore, even under an analysis which presumes that felonious assault is a lesser included offense, appellant was not entitled to such an instruction. A charge on a lesser included offense is only warranted if the evidence adduced at trial would "reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." State v. Thomas
(1988), 40 Ohio St.3d 213, paragraph two of the syllabus. An intent to kill may be presumed where the natural and probable consequences of a wrongful act are to produce death by the use of a deadly weapon. State v. Robinson (1954), 161 Ohio St. 213, paragraph five of the syllabus. In this case, nothing in the record indicates that the shooter intended anything other than to kill his victims, the natural, reasonable, and probable consequences of shooting a person in the head.
Therefore, the trial court committed no error since no instruction as to a lesser included offense was warranted by the evidence.
Accordingly, appellant's third assignment of error is not well-taken.
 IV.
Appellant, in his fourth assignment of error, argues that the verdict was against the manifest weight of the evidence. Although designated as a manifest weight issue, appellant also contends that the evidence was insufficient to convict him. Appellant suggests that the evidence was insufficient to establish that appellant was the person who fatally shot Denzmore or that the same gun was used on both Gray and Denzmore. Appellant also argues that eyewitness descriptions of the shooter were not credible because they were inconsistent and conflicting and, thus, against the manifest weight of the evidence.
We have previously applied the State v. Jenks (1991),61 Ohio St.3d 259 standard of review to both sufficiency and manifest weight of the evidence claims. However, the Supreme Court of Ohio has ruled that "the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380,386.
"Sufficiency" applies to a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of a crime. Id. Upon review of the sufficiency of the evidence to support a criminal conviction, an appellate court must examine
 "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
If a defendant's conviction is reversed based upon the sufficiency of the evidence, the defendant goes free. Thompkins, supra
at 388.
However, under a manifest weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. Id. at 387. The appellate court,
 "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
Additionally, the reversal must be by concurrence of all three judges and the defendant is then granted a new trial. Thompkins,supra at paragraph four of the syllabus. Since appellant's assignment of error encompasses both sufficiency and manifest weight issues, we must apply both standards.
Appellant was found guilty of murder in violation of R.C. 2903.02, which states, in pertinent part:
 "(A) No person shall purposely cause the death of another."
"Purposely" is defined in R.C. 2901.22(A) as follows:
 "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
As we previously noted, an intent to kill may be presumed where the natural and probable consequences of a wrongful act are to produce death by the use of a deadly weapon. Statev. Robinson (1954), 161 Ohio St. 213.
Appellant was also convicted of violating two penalty enhancing firearm specifications, R.C. 2929.71 (consecutive three years actual incarceration for conviction of any felony other than R.C. 2923.12 while having a firearm on or about his person or under his control) and 2941.141 (specification required in indictment in order to impose a sentence of actual incarceration for having a firearm on or about his person or under his control while committing a felony.)
Appellant was also found guilty of attempted murder with a firearm specification. He was charged with and convicted pursuant to the attempt statute, R.C. 2923.02, which provides:
 "(A) No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct which, if successful, would constitute or result in the offense."
In this case, Gray positively identified appellant as the man who shot him — a man who was only three feet from him, was lighted by the streetlight, and spoke directly with Gray. Gray also heard three or four additional gunshots while appellant stood over him. The shots sounded as if they came from the same gun. Additionally, Gray noted that right after those shots he heard appellant say, "This is Blood." Police testified that only .40 caliber casings and projectiles were found near and under the bodies of the victims. Although Gray's testimony may have been slightly conflicting as to collateral issues, he was unequivocal in his testimony as to the main sequence of events and that appellant was the person who shot him. Even appellant himself told police at one point that the same person shot both Gray and Denzmore.
Therefore, we conclude that sufficient evidence was presented from which, when viewed in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of murder and attempted murder proven beyond a reasonable doubt.
In considering appellant's manifest weight argument, we agree that some eyewitness testimony was conflicting in the descriptions of the shooter. Nevertheless, the victim, Michael Gray, provided credible and weighty evidence that appellant was the person who shot him and then turned to shoot Denzmore. When viewed in the context of the entire record (including the physical evidence, the testimony and statements of witnesses and the victim Gray, and especially appellant's ever changing and self-incriminating statements to police), we cannot say that the jury lost its way and created a manifest miscarriage of justice. Therefore, appellant's conviction was not against the manifest weight of the evidence.
Accordingly, appellant's fourth assignment of error is not well-taken.
 V.
Appellant, in his fifth assignment of error, states that the prosecution's comments during closing statements were prejudicial.
Both the prosecution and the defense have wide latitude during opening and closing arguments; questions as to the propriety of these arguments is generally left to the trial court's discretion. See State v. Loza (1994), 71 Ohio St.3d 61, 78; Statev. Brown (1988), 38 Ohio St.3d 305, 317. Generally, a prosecutor's conduct at trial is not grounds for reversal unless that conduct deprives the defendant of a fair trial. Loza, supra. "The test for prosecutorial misconduct is whether the [prosecutor's] comments were improper and, if so, whether they prejudicially affected substantial rights of the accused." Statev. Eley (1996), 77 Ohio St.3d 174, 187; State v. Lott (1990),51 Ohio St.3d 160, 165. A closing argument must be reviewed in its entirety to determine whether prejudicial effect occurred. Statev. Frazier (1995), 73 Ohio St.3d 323, 342.
In this case, appellant objected to the following comments by the prosecutor:
 "During Mr. Wingate's very skilled cross-examination of Detective Molnar, he was referring to certain reports generated by other officers involving descriptions given by other witnesses or people who claimed to have the information. But I notice, ladies and gentlemen, he didn't have the courage to call them as witnesses to have them testify for you personally."
Based upon our review of the prosecutor's entire closing argument, we cannot say that this comment was so improper that it prejudiced appellant's rights to a fair trial. Moreover, after appellant's objection, the prosecution refrained from referring again to witnesses not called. In addition, the trial court cured any possible error by instructing the jury as to the state's burden of proof and that closing arguments of counsel are not evidence. Therefore, we cannot say that the trial court abused its discretion in overruling appellant's objection to the prosecutions closing comments.
Accordingly, appellant's fifth assignment of error is not well-taken.
 VI.
Appellant, in his sixth assignment of error, contends that the cumulative effect of the trial court's errors served to violate appellant's state and federal constitutional rights to due process.
Since we have determined that the trial court did not commit reversible error, we conclude that appellant's sixth assignment of error is without merit.
Accordingly, appellant's sixth assignment of error is not well-taken.
The judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 _______________________________ Peter M. Handwork, P.J.
JUDGE
 _______________________________ Melvin L. Resnick, J.
JUDGE
 _____________________________ James R. Sherck, J.
JUDGE
CONCUR.
[1] Jackson first described the shooter as a light-skinned black male, 5'2" to 5'3," 125-130 pounds, 16 to 17-years old, small Afro, wearing a black T-shirt and black Dickey pants. In another description, Jackson said the shooter was a light-skinned black male, 5'7" tall, 140-150 pounds, twenty-one years old, two inch Afro, and possibly clean-shaven. Jackson later described the man who shot Denzmore as a black male, six feet, 260 pounds, "skinny," and wearing a red T-shirt, and said that this man could also have shot Gray.
[2] Names in quotes are the designated "street names" of the persons involved. Detective Molnar indicated that, through his investigation, he was able to discover "Junior's" real name, but was never able to find out who "Tony Hutchinson" was or if he even existed.