JOURNAL ENTRY and OPINION
{¶ 1} Appellant Patricia Taylor appeals her convictions for ten counts of illegal processing of drug documents, ten counts of deception to obtain dangerous drugs, and ten counts of possession of drugs. Taylor assigns six errors for our review.[1]
 {¶ 2} Having reviewed the record and pertinent law, we affirm Taylor's convictions. The apposite facts follow.
 {¶ 3} The Cuyahoga County Grand Jury indicted Taylor on thirty counts. Counts one through ten charged Taylor with illegal processing of drug documents in violation of R.C. 2924.23, felonies of the fifth degree; counts eleven through twenty charged Taylor with deception to obtain dangerous drugs in violation of R.C. 2925.22, felonies of the fifth degree; and counts twenty-one through thirty charged Taylor with possession of drugs in violation of R.C. 2925.11, felonies of the fourth degree.
 {¶ 4} Prior to the commencement of trial, Taylor waived her right to a jury. The matter was, therefore, tried to the bench.
 {¶ 5} On May 23, 2002, Taylor went to see Dr. Mirza Baig, whose office is located in Rocky River, Ohio. Dr. Baig also has offices in Lakewood. Taylor claimed to have pain in her right hand. Medical Assistant Albert Christian took the preliminary information from Taylor and also took Taylor's vital signs. She was then placed in an examination room. Dr. Baig examined Taylor and determined he needed to perform an EMG test on Taylor's muscles. Taylor was instructed to put on a gown in order for the test to be conducted. Dr. Baig then left the room.
 {¶ 6} Albert Christian went to check on Taylor and discovered that Taylor had left the examination room without having the test done. He also noticed that the prescription pad, which had been left on the counter, was gone. Upon determining the doctor did not have the pad, Christian searched the room but did not find the pad.
 {¶ 7} Christian called the Rocky River police and filed a report. Christian also attempted to call Taylor, but the telephone number she gave was disconnected. Christian was contacted several months later by the Rocky River Police Department regarding Vicodin prescriptions that were allegedly written by Dr. Baig. Christian verified the prescriptions were written on forms from Dr. Baig's office. He noted, however, that they were not filled out in the manner Dr. Baig would use to prescribe a controlled substance and that Dr. Baig did not treat patients named "Larry Birrin" or "Sam Jarvan," which were the names on the prescriptions.
 {¶ 8} Detective Dale Smith, who works for the West Shore Drug Enforcement Bureau, testified that he received a report in May 2002 that a prescription pad was stolen from Dr. Baig's office in Rocky River. It was not until January 15, 2003, however, that he received the first report of fraudulent prescriptions being written via the stolen pad.
 {¶ 9} The first complaint was received from Al Corbett, the pharmacist at the North Olmsted Drug Mart. Corbett testified that on January 11, 2003, he filled a prescription for Vicodin for a "Larry Birrin." Corbett was suspicious because the patient lived in Broadview Heights, but the doctor's office was in Lakewood. The history of the patient also revealed four other prescriptions filled for Vicodin, which was unusual. Corbett asked his technician to notify him whether a female or male picked-up the prescription. Corbett's technician later told him it was a female. Corbett caught only a glimpse of the female as she left. Because it was Saturday, it was not until that Monday that Corbett was able to contact the doctor to verify the prescription. The doctor informed him he did not treat anyone by the name of "Larry Birrin" and did not write the current or past prescriptions. Corbett then called Detective Smith.
 {¶ 10} The following Wednesday, January 15, 2003, the female again attempted to fill the prescription, but Corbett refused. Corbett made the effort to look at the customer to provide police with a description. He described the customer as a very thin white woman with long, dark hair. She was "bundled" in winter clothing. Corbett was able to identify Taylor from the photo array Detective Smith presented.
 {¶ 11} Corbett testified that, while he was talking with Detective Smith, Corbett received a telephone call from the North Olmsted Wal-Mart pharmacy concerning the same prescription. The North Olmsted Wal-Mart and Drug Mart are in close proximity to each other. However, by the time Detective Smith arrived at the Wal-Mart pharmacy, Taylor had left.
 {¶ 12} Megan Heminger, the pharmacist at the North Olmsted Wal-Mart and her assistant, Karen Shaffstall, testified that Taylor came to their pharmacy on the evening of January 15, 2003. Shaffstall was suspicious of the prescription that Taylor was attempting to fill because additional writing on the prescription indicated Taylor had tried to fill the prescription at another pharmacy. When Shaffstall inquired about the prescription, Taylor told her that she had taken the prescription to CVS, but because it would cost forty dollars she decided to go to Wal-Mart, where it was cheaper. Shaffstall thought the forty-dollar price was unusually high, which reinforced her suspicions about the authenticity of the prescription.
 {¶ 13} Heminger attempted to call the doctor regarding the prescription, but she was unable to reach him because the office was closed. She then called the CVS that Taylor claimed to have visited. The CVS pharmacist informed Heminger that Taylor had been there earlier and that CVS had refused to fill the prescription because of the suspicion it was fraudulent. While on the phone with CVS, Heminger noticed Taylor appeared "panicked" and she asked that Heminger return the prescription to her. In a loud voice, Taylor stated she could not wait and would take the prescription to a pharmacy closer to her mother's home. Heminger then returned the prescription to Taylor, who then left the store.
 {¶ 14} Heminger immediately phoned area pharmacies, including the Drug Mart where Taylor had been earlier, to warn them about the fraudulent prescription. Detective Smith came to the pharmacy, where Shaffstall and Heminger gave their written statements. Both women described the customer as a very thin white woman with dark eyes and long, dark hair. She appeared disheveled and was "bundled" in a lot of clothing. Heminger also stated the customer had a very prominent nose. Both women separately identified Taylor from the photo array.
 {¶ 15} Sarah Howard, the pharmacy manager at the Target store located in Rocky River, testified that several prescriptions for Vicodin were filled for a "Sam Jarvan." According to Howard, the customer who usually dropped off the prescriptions was a short, thin, white woman with long, dark hair. Howard said the woman always wore a hat and a long coat. She identified Taylor from Detective Smith's photo array. According to Howard, the last prescription was found to be suspicious, but she was not working that day.
 {¶ 16} Jill Reese testified that on March 21, 2003, she was substituting for Howard at the Target pharmacy located in Rocky River. Reese usually worked at the Target pharmacy in Willoughby. On that date, Taylor attempted to fill a prescription for Vicodin for a person named "Sam Jarvan," who she claimed was her boss. Reese found it suspicious that an employer would trust an employee to fill a prescription for a narcotic. Therefore, she asked Taylor for the employer's telephone number. Taylor gave her a disconnected telephone number, which reinforced Reese's suspicion. She checked the history of the patient and found that "Sam Jarvan" had four other Vicodin prescriptions filled, which she also found unusual. Reese, however, filled the prescription.
 {¶ 17} It was not until Taylor left the pharmacy that she called the doctor's office and discovered the doctor did not have a patient by the name of "Sam Jarvan." At the doctor's request, she faxed the prescription to the office. The office verified it was neither Dr. Baig's handwriting nor his signature. Reese then called Detective Smith. She described the customer as a very thin white woman with a sunken face and long, dark hair. She also recalled the female had on a lot of clothes and wore a hat, which she found unusual given the weather. Reese was not presented with the photo array, but positively identified Taylor in court.
 {¶ 18} Dr. Baig testified that neither "Sam Jarvan" nor "Larry Birrin" were patients of his. He also stated he did not write any prescriptions for these individuals.
 {¶ 19} The trial court found Taylor guilty of all thirty counts. The trial court sentenced her to two and one-half years of community control sanction. Taylor now appeals.
 {¶ 20} In her first and second assigned errors, Taylor contends her convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. We disagree.
 {¶ 21} The standard of review with regard to the sufficiency of evidence is set forth in State v. Bridgeman:[2]
 "Pursuant to Criminal Rule 29(A), a court shall not order an entry ofjudgment of acquittal if the evidence is such that reasonable minds canreach different conclusions as to whether each material element of acrime has been proved beyond a reasonable doubt."[3]
 {¶ 22} Bridgeman must be interpreted in light of the sufficiency test outlined in State v. Jenks,[4] in which the Ohio Supreme Court held:
"An appellate court's function when reviewing the sufficiency of theevidence to support a criminal conviction is to examine the evidencesubmitted at trial to determine whether such evidence, if believed, wouldconvince the average mind of the defendant's guilt beyond a reasonabledoubt. The relevant inquiry is whether, after viewing the evidence in alight most favorable to the prosecution, any rational trier of fact couldhave found the essential elements of the crime proven beyond a reasonabledoubt. (Jackson v. Virginia [1979], 443 U.S. 307, 99 S.Ct. 2781,61 L.Ed.2d 560, followed.)[5]
 "Although a court of appeals may determine that a judgment of a trialcourt is sustained by sufficient evidence, that court may neverthelessconclude that the judgment is against the weight of the evidence. * * *Weight of the evidence concerns `the inclination of the greater amount ofcredible evidence, offered in a trial, to support one side of the issuerather than the other. It indicates clearly to the jury that the partyhaving the burden of proof will be entitled to their verdict, if, onweighing the evidence in their minds, they shall find the greater amountof credible evidence sustains the issue which is to be established beforethem. Weight is not a question of mathematics, but depends on its effectin inducing belief. * * *'"[6]
 {¶ 23} Taylor contends that the counts relating to prescriptions filled at the Drug Mart and Target pharmacies on November 23, 2002, December 12, 2002, December 20, 2002, December 26, 2002, February 6, 2003, and February 14, 2003, are not supported by sufficient evidence and are against the manifest weight of the evidence, because no evidence was presented regarding the person who dropped off or picked up these prescriptions.
 {¶ 24} Although we agree there is no direct evidence that Taylor was involved in presenting these prescriptions, the circumstantial evidence is overwhelming. Circumstantial evidence and direct evidence inherently possess the same probative value.[7] As the Court in State v. Jenks
held, "In some instances certain facts can only be established by circumstantial evidence. Hence, we can discern no reason to continue the requirement that circumstantial evidence must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt."[8]
 {¶ 25} In the instant case, there is evidence that Taylor stole the prescription pad from Dr. Baig's office. Thereafter, fraudulent prescriptions for Vicodin were written on the stolen pad. These prescriptions were submitted at the Target pharmacy in Rocky River and at the Wal-Mart and Drug Mart located in North Olmsted. These prescriptions all used the same fictitious names of "Larry Birrin" and "Sam Jarvan." Taylor was identified by pharmacists at the three pharmacies as the woman attempting to have the prescriptions filled for these fictitious individuals. Although the date on which Taylor was identified as the perpetrator did not coincide with the above dates, a pattern was established, implicating her.
 {¶ 26} Moreover, Sarah Howard, the Chief Pharmacist at the Target pharmacy, testified that Taylor was the same woman who had presented the prior prescriptions. Taylor argues that Howard's identification was unreliable because Howard dealt with approximately 75 to 150 customers a day. She also contends that the photo array may have tainted Howard's description of the person presenting the prescriptions. However, we find these contentions to be matters of credibility. Howard was shown only two photographs and identified the photograph of Taylor as the perpetrator. She also described Taylor as short and as always wearing a hat and coat, which was consistent with the other pharmacists' descriptions of Taylor, and which are not characteristics portrayed in the photograph.
 {¶ 27} Taylor also contends the identification by pharmacist Jill Reese was unreliable because Reese was not shown a photo array to identify Taylor and made the in-court identification nine months after Taylor allegedly presented the prescription. Reese, however, provided a physical description of Taylor which matched the description given to detectives by the other pharmacists. Although she did not mention Taylor's prominent nose as did the Wal-Mart pharmacist, she described Taylor as a very thin white woman with long, dark hair, who was "bundled" in a lot of clothes and wearing a hat.
 {¶ 28} Therefore, based on this evidence, we find Taylor's convictions are not against the manifest weight of the evidence. Accordingly, Taylor's first and second assigned errors are overruled.
 {¶ 29} In Taylor's third, fourth, and fifth assigned errors, she argues she was provided with ineffective assistance of counsel because her lawyer failed to retain an expert in handwriting analysis, failed to retain an expert on eyewitness identification, and failed to move to suppress the photo array.
 {¶ 30} This court reviews a claim of ineffective assistance of counsel under the two-part test set forth in Strickland v. Washington.[9] UnderStrickland, a reviewing court will not deem counsel's performance ineffective unless a defendant can show his lawyer's performance fell below an objective standard of reasonable representation and that prejudice arose from the lawyer's deficient performance.[10] To show prejudice, a defendant must prove that, but for his lawyer's errors, a reasonable probability exists that the result of the proceedings would have been different.[11] Judicial scrutiny of a lawyer's performance must be highly deferential.[12]
 {¶ 31} We disagree with Taylor's contention that counsel's failure to obtain a handwriting expert and an expert to testify regarding the unreliability of eyewitness testimony, constituted ineffective assistance of counsel. The evidence presented did not indicate that someone other than Taylor could have been responsible for the fraudulent prescriptions. Taylor was identified as the person who stole the prescription pad. Witnesses from several different pharmacies clearly identified her as the person presenting the fraudulent prescriptions.
 {¶ 32} Moreover, handwriting can be disguised, and on cross-examination, Taylor's attorney emphasized that the pharmacists saw 75 to 150 people per day, and viewed Taylor only for short periods of time. Therefore, any expert testimony would not have impacted the result of the trial.
 {¶ 33} Taylor also contends counsel was ineffective for failing to move to suppress the photo array, which she contends was unduly suggestive because it contained only two photographs.
 {¶ 34} Convictions based on eyewitness identification at trial after a pretrial photographic identification will not be overturned unless the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.[13] The existence of notable flaws in the identification procedure does not, per se, preclude the admissibility of the identification testimony as long as the challenged identification itself is reliable.[14]
 {¶ 35} Relevant factors in assessing the reliability of eyewitness identification testimony include the witness' opportunity to view the criminal at the time of the crime, the witness' degree of attentions, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.[15]
 {¶ 36} In the instant case, both photographs were procured from the Bureau of Motor Vehicles; therefore, they were of the same size and type. Both photographs depicted white women with long, dark hair. There is nothing to indicate that Detective Smith said or did anything suggestive while the witnesses were viewing the photographs.
 {¶ 37} The photo array was shown to all but one of the pharmacists within hours of Taylor's attempting to fill the prescription. Additionally, all of the pharmacists provided Detective Smith with the same description of a thin, white woman with long, dark hair who was "very bundled" in winter clothing and wearing a hat. The Wal-Mart pharmacist also noted that the woman had a prominent nose.
 {¶ 38} We conclude the circumstances surrounding the photo array sufficiently demonstrated the reliability of the witnesses' identification. Therefore, although we agree it would have been prudent to use more than two photographs, we find that the testimony of the witnesses established an independent basis for their identification of Taylor. Thus, counsel's failure to move to suppress the photo array was not prejudicial. Taylor's third, fourth, and fifth assigned errors are overruled.
 {¶ 39} In her sixth assigned error, Taylor argues the crimes of illegal processing of drug documents, deception to obtain dangerous drugs, and possession of drugs are allied offenses of similar import and, therefore, should have been merged.
 {¶ 40} R.C. 2941.25 provides:
"(A) Where the same conduct by defendant can be construed to constitutetwo or more allied offenses of similar import, the indictment orinformation may contain counts for all such offenses, but the defendantmay be convicted of only one.
 {¶ 41} "(B) Where the defendant's conduct constitutes two or moreoffenses of dissimilar import, or where his conduct results in two ormore offenses of the same or similar kind committed separately or with aseparate animus as to each, the indictment or information may containcounts for all such offenses, and the defendant may be convicted of allof them."
 {¶ 42} The Ohio Supreme Court explained the analysis for determining whether multiple crimes constitute allied offenses of similar import as follows:
"In the first step, the elements of the two crimes are compared. If theelements of the offenses correspond to such a degree that the commissionof one crime will result in the commission of the other, the crimes areallied offenses of similar import and the court must then proceed to thesecond step. In the second step, the defendant's conduct is reviewed todetermine whether the defendant can be convicted of both offenses. If thecourt finds either that the crimes were committed separately or thatthere was a separate animus for each crime, the defendant may beconvicted of both offenses."[16]
 {¶ 43} The Ohio Supreme Court in State v. Rance[17] clarified this analysis by explaining that the elements of alleged allied offenses are to be compared in the abstract. The Rance decision overruled Newark v.Vazirani[18] and its progeny, which required the comparison of the elements of each crime by referring to the particular facts in the indictment.
 {¶ 44} Under Rance, a court in determining if two crimes are crimes of similar import, must align the elements of each crime in the abstract to determine whether the statutory elements of the crimes correspond to such a degree that the commission of one crime will result in the commission of the other.[19] If the elements do so correspond, the defendant may not be convicted of both unless the court finds that the defendant committed the crimes separately or with separate animus.[20]
 {¶ 45} R.C. 2925.23, the statute prohibiting the illegal processing of drug documents, states, "No person shall intentionally make, utter, or sell, or knowingly possess any of the following that is a false or forged * * * prescription."
 {¶ 46} R.C. 2925.22, the statute prohibiting deception to obtain dangerous drugs provides "No person, by deception, as defined in section2913.01 of the Revised Code, shall procure the administration of, a prescription for, or the dispensing of, a dangerous drug, * * *."
 {¶ 47} R.C. 2925.11, the statute which prohibits the possession of drugs, provides, "No person shall knowingly obtain, possess, or use a controlled substance."
 {¶ 48} When the three statutes involved in this case, R.C. 2925.23, R.C. 2925.22, and R.C. 2925.11 are examined in the abstract, the statutes are not allied offenses of similar import. The crime of possession of drugs could certainly be accomplished without making, possessing, or presenting false prescriptions.
 {¶ 49} Likewise, when R.C. 2925.22 and R.C. 2925.23 are compared in the abstract they also are not allied offenses. A person could make, utter, sell, or possess a forged prescription without the intent of obtaining a "dangerous" drug as required under the statute prohibiting deception to obtain illegal drugs. Although admittedly they appear to be crimes of similar import when compared to the facts of this case, when compared in the "abstract" as we are required to do, they are not.
 {¶ 50} Therefore, when these statutes are compared in the abstract, we conclude that each statutory violation could be committed without automatically violating one of the other statutes. Thus, we find that the statute violations are not allied offenses of similar import. Accordingly, Taylor's sixth assigned error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, J., and Corrigan, J., concur.
 APPENDIX Assignments of Error
 "I. Appellant's convictions are not supported by sufficient evidencewhere the identity of the patron who brought the prescriptions to befilled was not established."
 "II. Appellant's convictions are against the manifest weight of theevidence where the government failed to provide evidence that theappellant presented the forged prescriptions for filling."
 "III. Trial counsel was ineffective for failing to obtain a handwritingexpert to compare the signatures of Ms. Taylor with the signatures of theperson(s) who committed the various criminal offenses."
 "IV. Trial counsel was ineffective for failing to provide an expert onthe reliability of eyewitness testimony."
 "V. Trial counsel was ineffective when he failed to move to suppressthe unduly suggestive photo array used by Detective Smith."
 "VI. The trial counsel's failure to merge the lesser offense into thegreater offenses violates the double jeopardy clause of theFifth Amendment of the United States Constitution and Section 10, Article I ofthe Ohio Constitution."
[1] See Appendix.
[2] (1978), 55 Ohio St.2d 261, syllabus.
[3] See, also, State v. Apanovitch (1987), 33 Ohio St.3d 19, 23; Statev. Davis (1988), 49 Ohio App.3d 109, 113.
[4] (1991), 61 Ohio St.3d 259.
[5] Id. at paragraph two of the syllabus.
[6] State v. Thompkins (1997), 78 Ohio St.3d 380, 386-87.
[7] State v. Jenks (1991), 61 Ohio St.3d 259, paragraph one of the syllabus.
[8] Id. at 272.
[9] (1984), 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052.
[10] State v. Bradley (1989), 42 Ohio St.3d 136, paragraph one of syllabus.
[11] Id. at paragraph two of syllabus.
[12] State v. Sallie (1998), 81 Ohio St.3d 673, 674.
[13] Simmons v. United States (1968), 390 U.S. 377, 384,19 L.Ed. 2d 1247, 88 S.Ct. 967.
[14] State v. Merrill (1984), 22 Ohio App.3d 119, 121.
[15] Id. at 121-122.
[16] State v. Nicholas (1993), 66 Ohio St.3d 431, 434, quoting Statev. Blankenship (1988), 38 Ohio St.3d 116, 117.
[17] 85 Ohio St.3d 632, 633, 1999-Ohio-291.
[18] (1990), 48 Ohio St.3d 81.
[19] Id. at 638.
[20] Id. at 638-639.