THE STATE OF OHIO, APPELLEE, *v.*
MERRILL, APPELLANT.

(No. 48624—Decided
December 17, 1984.)

*John T. Corrigan,* prosecuting attorney, for appellee.

*Michael H. Peterson,* for appellant.

RUSSO, J. Defendant-appellant, Bruce A. Merrill (defendant), appeals his conviction for grand theft, a violation of R.C. 2913.02. For the reasons adduced below, the judgment is reversed.

I

At 9:15 p.m., June 16, 1982, Officer Joseph Hamar received a radio broadcast directing him to respond to a person wanting to report a crime. Fifteen minutes later, the officer and his partner, Patrolman Jack Smith, arrived at 1266 West 116th Street, the home of Mrs. Lehmann. There, they spoke with Mr. Thurman Buckley who reported that his automobile, a 1979 Mercury Cougar, had been stolen.[1] Officer Hamar testified that the crime report stated the victim indicated the time of the theft to have been between 8:45 p.m. and 9:00 p.m.

While there, the officers interviewed Mrs. Lehmann's daughter, Tina Lehmann. Reading from the crime report, Officer Hamar testified Miss Lehmann described the thief as "a white male, young, about 21 years old, about five foot eight, weighed about 125 pounds, brown curly hair. That he had a white shirt on and a dark jacket." The

[1] Buckley was dating Mrs. Lehmann at the time of the theft.

officer stated sunset that day was at 9:30 p.m.

Tina testified she was washing dishes at the kitchen sink when the offense occurred. As she looked out of the kitchen window above the sink, she saw a man walk into a parking lot, open the driver's door of the stolen vehicle, look around, get in, and drive out of the parking lot.[2] Tina explained that while the thief was opening the door, he "did look up and glance like a three-quarter turn." Consequently, Tina's brother went across the street to a restaurant and returned with Buckley — the person who notified the police.

Tina Lehmann testified that at the time of the theft it was not raining, it was just getting dark, and the street lights were just coming on. A floodlight over the parking lot was also on.

At trial, Tina Lehmann testified she described the individual to the officers as:

"Early 20's, about 145 pounds, five eight. He had dark brown curly hair, had a dark blue jacket, blue jacket with a zipper and like a white shirt underneath and blue jeans."

On cross-examination, the eyewitness agreed she stated the thief's hair was fluffy and worn in an "Afro." At trial, Tina identified defendant as the man who stole the vehicle.

On June 30, 1982, Detective Saggio executed a search warrant for a "chop shop" located at 941 Clark Avenue. Four people were arrested at the scene and various pieces of stolen property were recovered. Through a subsequent investigation and utilization of Cleveland Police Department records, the detective discovered that out of the recovered stolen parts, a 1979 Mercury Cougar steering column with inserted ignition key and the driver's door from the same vehicle were identified as parts of Buckley's stolen automobile.

On August 26, 1982, the detective interviewed Tina Lehmann "and showed her a photo array of nine colored mug shots of white males." The purpose of the array was to determine whether the witness could identify the thief who stole Buckley's automobile. However, as was brought out at the motion to suppress hearing, the detective permitted Tina to review the actual theft report containing her description of the thief before she examined the photographs.

During the interview, the detective handed the nine photographs face up in a stack to Tina Lehmann. Looking at just the fronts of the photographs, she selected the defendant's picture without hesitation.

Four of the nine photographs were of the four people arrested at the "chop shop." A fifth picture was of a suspect who was also "wanted in connection" with the shop. On cross-examination, Tina agreed State's Exhibits 4-10 depicted men having straight hair. Of the two remaining pictures, State's Exhibit 3 represents a man who has curly brown hair but who barely has any hair on the top of his head.

On August 27, 1982 Tina went to the station house and made a statement. The detective handed the array to Tina and she again chose the defendant's photograph. At trial the array was entered into evidence.

Defendant was indicted on June 29, 1983, on one count of grand theft of a motor vehicle — a violation of R.C. 2913.02.

On February 17, 1984, defendant's motion to suppress the eyewitness identification testimony of Tina Lehmann was heard and overruled. In overruling the motion, the trial court determined

---

[2] Tina Lehmann is nearsighted. This implies she does not need glasses for "near vision." She testified she was wearing her glasses while washing dishes.

that defendant's constitutional rights were not violated.

Trial began February 22, 1984. The jury found defendant guilty. He was sentenced to a two-year definite term. Defendant assigns two errors:

Assignment of Error No. I

"The trial court erred in overruling appellant's pretrial motion to suppress the identification testimony of the prosecution's sole eyewitness as such identification was irreparably tainted by unfair and improperly suggestive photographic identification procedure prior to trial."

Assignment of Error No. II

"The prosecutor's references during closing argument to matters not contained in the record prejudiced appellant's right to due process of law to such an extent that reversal of appellant's conviction is required."

II

The defendant's first assigned error deals with the identification procedure used by the state in the pretrial stage of this case.

In the seminal case of *Simmons* v. *United States* (1968), 390 U.S. 377, 384, the United States Supreme Court held:

"[E]ach case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. This standard accords with our resolution of a similar issue in *Stovall* v. *Denno*, 388 U.S. 293, 301-302, and with decisions of other courts on the question of identification by photograph." (Footnote omitted.)

In arriving at this determination, the court addressed the possible dangers in eyewitness identifications.

"It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." (Footnotes omitted.) *Id.* at 383-384.

Furthermore, the Ohio Supreme Court has held in *State* v. *Moody* (1978), 55 Ohio St. 2d 64, 67 [9 O.O.3d 71]:

"Although the identification procedure may have contained notable flaws, this factor does not, *per se*, preclude the admissibility of the subsequent in-court identification. See *State* v. *Barker* (1978), 53 Ohio St. 2d 135, 142-143 [7 O.O.3d 213]. As noted in *Manson* v. *Brathwaite* (1977), 432 U.S. 98, 53 L.Ed.2d 140, 154, '* * * reliability is the linchpin in determining the admissibility of identification testimony * * *.' The factors affecting reliability include '* * * the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness'

prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' *Neil* v. *Biggers* (1972), 409 U.S. 188, 199. Thus, although the identification procedure is suggestive, so long as the challenged identification itself is reliable, it is admissible. *Manson, supra,* at 151."

Before reaching the question of whether or not the eyewitness identification was reliable under the totality of the circumstances test, the court must first determine if the confrontation procedure itself was suggestive. See *United States* v. *Briggs* (C.A. 7, 1983), 700 F.2d 408, 412, certiorari denied (1983), 77 L.Ed.2d 1340.

Testimony revealed that seven of the nine photographs shown to the eyewitness depicted men with straight hair. Of the two remaining photographs, one showed a man with hardly any hair on top of his head. The defendant was the only person in the array with a full head of curly brown hair. Tina Lehmann's description of the thief never indicated he was bald or balding.

Almost all of the men in the photographs were much older than twenty-one years of age. Moreover, six of the nine men were thirty to fifty pounds heavier than the one-hundred-twenty-five pound estimate that was originally given. In looking at the hair, age, and weight factors the photographic array was suggestive.[3]

The court now turns to the matter of reliability. Notwithstanding the use of an earlier suggestive identification procedure, the in-court identification is admissible where the state shows by clear and convincing evidence that the in-court identification has its origin in observation independent from pretrial identification, *State* v. *Lathan* (1972), 30 Ohio St. 2d 92, 96 [59 O.O.2d 109]; *State* v. *Moody, supra.* The same factors which are used in testing the reliability of a pretrial identification are used in determining whether or not the in-court identification was of an independent origin. *Moody, supra.* The standards as used in *Biggers, supra,* and *Moody, supra,* will be used in the analysis.

## II

### A

*The opportunity to view the criminal.* Tina Lehmann testified that to the best of her knowledge it was not raining at the time of the occurrence of the crime and it was just getting dark. She did state that a floodlight above the parking lot and street lights were on. However, the witness also testified she only saw a three-quarter view of the thief's face from a distance of fifty to sixty feet. There was no testimony establishing how much time Tina had to observe the thief in the period of half light. The court can only assume it was a matter of seconds. Thus, the witness' opportunity to observe the thief was at least limited by lighting conditions, distance and time.

### B

*The degree of attention.* Tina testified she observed the thief while she was washing dishes. There was no testimony that she stopped her work and directed her attention to the man walking in the parking lot. Furthermore, it was not demonstrated that the witness was a trained observer who "could be expected to pay scrupulous attention to detail." *Manson* at 115.

---

[3] Cf. ALI Model Code of Pre-Arraignment Procedure (1975) 77, Section 160.2(2):

"Photographic identifications. If the identification is to be made from photographs, drawings or other representations, the witness shall be presented with an array of representations of several persons. Such array shall so far as practicable include a reasonable number of persons similar to any person then suspected whose likeness is included in the array."

## C

*The accuracy of the description.* The theft occurred at approximately 8:45 p.m. The officers did not arrive at the scene of the crime until 9:30 p.m. First the officers took the owner's statement, then the witness'. Hence, at least forty-five minutes elapsed from the time Tina saw the man until the police were even on the scene. The description of the thief contained in the officer's crime report included the man's race, approximate age, *viz.*, young, about twenty-one years old, height, weight, *viz.*, about one hundred twenty-five pounds, hair style and color. The record shows the defendant was twenty-seven years old and weighed one hundred sixty-five pounds.

## D

*The witness' level of certainty demonstrated at the confrontation.* In choosing the defendant's photograph from the array, Tina testified that she was certain the selected photograph was the correct one. However, Detective Saggio testified he allowed the witness to review her original description of the thief prior to her viewing of the array.

## E

*The length of time between the crime and the confrontation.* The description was given on June 16, 1982. The photographic identification took place on August 26, 1982 — over ten weeks later. It should also be noted, Tina testified she thought the detective's first interview with her, the one where she examined the photographs, took place in June 1982.

Significant indicia of reliability were lacking for the pretrial identification and the subsequent in-court identification based on independent observation. This court cannot conclude that the state has shown by clear and convincing evidence that the in-court identification was reliable and had its origin in observation independent from the pretrial identification. When the "corrupting effect" of the suggestive pretrial identification is weighed against the factors of reliability, it can be said that under all the circumstances there was "a very substantial likelihood of irreparable misidentification." *Manson* at 116; *Simmons* at 384. The weakness of the identification left substantial room for doubt that the identification of the defendant was correct.

Defendant's first assignment of error is well-taken.

## III

Defendant's second assignment of error is that he was denied a fair trial as a result of the prosecutor's remarks during closing argument regarding matters not contained in the record.

In the course of its efforts to prove that defendant stole a 1979 Mercury Cougar on June 16, 1982, the state presented evidence to show that certain parts of the automobile were discovered at the "chop shop" located at 941 Clark Avenue. Pursuant to a search warrant, the shop had been raided by Cleveland police. The raid culminated in the arrest of four men.

In closing, in an apparent attempt to impeach the credibility of defendant's witness (William Murray), the prosecutor referred to the witness' testimony as "the Bill Murray Show." Murray had testified that defendant showed him a 1971 Pontiac Grand Prix which could be purchased by the witness at a price "slightly under market." The prosecutor made repeated suggestions that the automobile which defendant offered to sell was a stolen car.[4]

---

[4] "If the Defendant wanted to assert his alibi he would have the best evidence. If he brought a certain Pontiac, his personal property out to Mr. Murray to be purchased, you can bet that if Bruce Merrill owned a Pontiac at the time, that title would be here, too.

The only evidentiary basis for the remarks was Murray's testimony that defendant showed him a Pontiac which could be purchased for slightly under market.

The United States Court of Appeals in *United States* v. *Dorr* (C.A. 5, 1981), 636 F.2d 117, 120, stated:

"A prosecutor's duty in closing arguments is to be scrupulous and to avoid all efforts to obtain a conviction by going beyond the evidence before the jury or by putting the sanction of his office behind the testimony of the witnesses. * * * The sole purpose of closing argument is to assist the jury in analyzing, evaluating and applying the evidence." (Citations omitted.)

In *Berger* v. *United States* (1935), 295 U.S. 78, 88, the Supreme Court stated that a prosecutor:

"* * * may prosecute with earnestness and vigor — indeed, he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

"It is fair to say that the average jury, in a greater or less [*sic*] degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."

The prosecutor's remarks were used to imply that the Pontiac was stolen. The import of the suggestions was to implant the notion in the minds of the jurors that the defendant was a dealer in stolen automobiles. The prosecutor's remarks were drawn from material outside the record for the purpose of creating the illusion that the defendant's alleged actions were true.

The second assignment of error is well-taken.

The judgment of the trial court is reversed and remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

JACKSON, P.J., concurs.

PATTON J., dissents.

---

"Ladies and gentlemen, I submit to you that Mr. Bill Murray is mistaken.

"* * *

"As I mentioned before, I dare say there is no Grand Prix that would be titled in his name or the title would be here.

"MR. CLIMACO: Objection, your Honor. I ask that that be stricken.

"THE COURT: I didn't hear exactly what you said.

"MR. COLUMBRO: Judge, strike whatever Mr. Climaco cares to.

"The evidence, I am sure this jury will recall, and I am merely making comment about what would have been the best evidence to bring here to prove this alibi.

"MR. CLIMACO: I am talking about fundamental fairness as to what this jury has heard. I don't want little things thrown in.

"THE COURT: Approach the bench. (Thereupon, a side bar conference was had.)

"THE COURT: The jury is instructed to disregard the statement pertaining to the title to the automobile.

"MR. COLUMBRO: Ladies and gentlemen, Mr. Bill Murray, the Bill Murray Show, if you will, * * *.

"* * *

"Indeed he was correct about one thing, Bruce could sell him a car though it might be a little warm if not a little hot.

"MR. CLIMACO: Objection, your Honor.

"THE COURT: Overruled.

"MR. COLUMBRO: Bruce could offer to Mr. Murray a price substantially below market. Isn't that what the witness said?

"I think it was. I think the witness said that the price for the Pontiac was going to be substantially below market. I will buy that."

PATTON, J., dissenting. I must respectfully dissent from the position reached by the majority. It is my considered opinion, as will be discussed more fully below, that the photographic identification procedure was neither unfair nor improperly suggestive and that the prosecutor's statements during closing argument were not prejudicial.

I

I approve of the majority's cite to *State* v. *Moody* (1978), 55 Ohio St. 2d 64, 67 [9 O.O.3d 71], wherein the court quoted *Manson* v. *Brathwaite* (1977), 432 U.S. 98:

" '* * * reliability is the linchpin in determining the admissibility of identification testimony * * *.' *The factors affecting reliability include '* * * the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' Neil* v. *Biggers* (1972), 409 U.S. 188,199." (Emphasis added.)

The majority held that the confrontation procedure itself was suggestive. I respectfully disagree. The description of the thief contained in the officer's crime report included the man's race, approximate age, *viz.,* young, about twenty-one years old, height, weight, *viz.,* about one hundred twenty-five pounds, hair style and color. However, at both the suppression hearing and the trial, Tina Lehmann's testimony was that she described the individual to the officers as:

"Early 20's, about 145 pounds, five eight. He had dark brown curly hair, had a dark blue jacket, blue jacket with a zipper and like a white shirt underneath and blue jeans."

Her testimony remained unshakeable as to the description she gave the police despite an attempt by appellant's counsel to discredit it by illustrating the discrepancies between her testimony and the description contained in the crime report. Furthermore, she was able to identify the appellant in court, stating he had a fluffy afro haircut.

After reviewing the photographs contained in the display, it is my considered opinion that the identification procedure was not suggestive. A careful review of the photographs indicates that they constitute a valid photo display of men who fit the general description given by Ms. Lehmann.[5] The record shows the defendant was twenty-seven years old and weighed one hundred sixty-five pounds. The men in the photo display were within a normal weight range with weights varying an average of thirteen pounds. The men's ages were also within the normal range with an average difference of five and one-half years, and with twenty-five years old and forty-two years old being the outside parameters of the ages. In addition, three of the photos show men with curly brown hair. Therefore, notwithstanding any discrepancies, it is not the duty of this appellate court to substitute its judgment for that of the trial court.

Furthermore, Tina Lehmann had adequate opportunity to view the criminal. She testified that she had several minutes to observe the appellant walk into the parking lot, look around, and open the door as if he had a

---

[5] ALI Model Code of Pre-Arraignment Procedure (1975), 77, Section 160.2(2):

"Photographic Identifications. If the identification is to be made from photographs, drawings or other representations, the witness shall be presented with an array of representations of several persons. Such array shall so far as practicable include a reasonable number of persons similar to any person then suspected whose likeness is included in the array."

key. She testified that her vision was not obstructed by rain or any other object.

In addition, there is evidence that Ms. Lehmann afforded the appellant the degree of attention needed pursuant to *Moody*. She saw him approach a car she knew belonged to Buckley. Therefore, her attention would be focused on the appellant's actions. The majority asserts that there is no testimony to establish how much time Tina had to observe the thief during that period. This assertion is incorrect. Ms. Lehmann testified that she witnessed the entire incident which lasted *several minutes;* that *fifteen to twenty seconds* elapsed from the time the accused got in the car door and drove away; and that she had *two or three minutes* to look at the man take the car. That is a considerable length of time to observe many details of the appellant's appearance.

The record *sub judice* indicates consistent testimony by Ms. Lehmann regarding her certainty as to who committed the theft. Moreover, the court in *Moody* held that it is the function of the jury to decide the trustworthiness of Lehmann's testimony during trial. Expanding upon that holding, it could equally be stated that it is the function of the judge to decide the trustworthiness of the witness' testimony at a suppression hearing.

The time span from the date of the offense until the identification of the appellant was not unduly long. The theft occurred on June 16, 1982 and Ms. Lehmann identified the appellant on August 26, 1982. Furthermore, it was the function of the jury to decide the witness' credibility using the length of time as one factor. If the identification had occurred two years as opposed to two months after the theft, then the jury may have questioned the witness' credibility.

Accordingly, I find that there was no unfair or suggestive photograph display and that the testimony of Ms.

Lehmann was reliable. I dissent from the position assumed by the majority.

## II

The majority has also ruled that the prosecutor's remarks were drawn from material outside the record for the purpose of creating the illusion that the defendant was a dealer in stolen automobiles. I respectfully disagree for the following reasons:

During the cross-examination of William Murray, Murray admitted that the price the appellant was asking for the Pontiac was under market. Furthermore, Murray testified that the appellant had stated that the Pontiac was his car. During the trial, appellant did not present into evidence any title of ownership. Therefore, the prosecutor had the right to inform the jury of that particular fact.

In addition, even if the prosecutor's remarks constituted error, it should be held harmless. Murray was an alibi witness. If we remove his testimony from the record, there is still substantial evidence to support the guilty verdict for grand theft. In *State* v. *Davis* (1975), 44 Ohio App. 2d 335 [73 O.O.2d 395], this court held at 347:

"The Ohio test then for determining whether the admission of inflammatory and otherwise erroneous evidence is harmless non-constitutional error requires the reviewing court to look at the whole record, leaving out the disputed evidence, and then to decide whether there is other substantial evidence to support the guilty verdict. If there is substantial evidence, the conviction should be affirmed, but if there is not other substantial evidence, then the error is not harmless and a reversal is mandated."

We must not lose sight of the fact that the actual crime which was committed was grand theft. Furthermore, Tina Lehmann was an eyewitness to the crime and her testimony was more than

substantial to convict the appellant of that crime.

Accordingly, I dissent from the position assumed by the majority.

Judgment should be affirmed.