JOURNAL ENTRY and OPINION
{¶ 1} Appellant Ishmael Brown appeals his conviction and sentence. Brown assigns the following errors for our review:
{¶ 2} "I. The trial court erred by denying defendant access tothe victim's medical records from the date and time she firstaccused defendant of rape."
 {¶ 3} "II. The trial court erred by permitting pretrialidentification evidence in violation of defendant's rights to dueprocess."
 {¶ 4} "III. The trial court's failure to issue a warrant tosecure the testimony of a subpoenaed witness violated defendant'sright to compulsory process in violation of the Sixth Amendmentto the United States Constitution and Article I, Section 10 ofthe Ohio Constitution."
 {¶ 5} "IV. The trial court erred when it denied appellant'smotion for acquittal under Crim.R. 29."
 {¶ 6} "V. The conviction was against the manifest weight ofthe evidence."
 {¶ 7} "VI. The trial court erred by denying defendant's motionfor a new trial."
 {¶ 8} "VII. Defendant's sentence is contrary to law."
 {¶ 9} Having reviewed the law and pertinent facts, we affirm Brown's conviction, but vacate his sentence and remand for resentencing based on the Ohio Supreme Court's recent decision ofState v. Foster.[1] The apposite facts follow.
 {¶ 10} On December 20, 2004, the Cuyahoga County Grand Jury indicted Brown on one count of rape and one count of kidnapping. Brown pled not guilty at his arraignment and the matter proceeded to a jury trial.
 Jury Trial {¶ 11} The State presented five witnesses, which included seventeen-year-old Jeremy.[2] Jeremy testified that in July 2004 he invited Ashley to the apartment, where he lived with his mother. Ashley arrived with two other girls, Brittany and Kristin. Jeremy stated that Ishmael Brown was present when the girls arrived.
 {¶ 12} Jeremy testified that they sat around in his bedroom listening to music and playing video games. Later, he, Ashley and Kristin left the bedroom and entered the living room while Brown and Brittany remained alone in the bedroom. Jeremy stated that Brown and Brittany remained in the room for about five to ten minutes. He stated the bedroom door was locked and he did not hear any sound coming from the room. Jeremy stated that after Brown and Brittany came out of the bedroom, Brittany, Ashley, and Kristin left the apartment.
 {¶ 13} Jeremy further testified that Brown and his mother, Johnnie May Brown, asked him to testify that Brown was not in the bedroom alone with Brittany. Finally, Jeremy testified that he accompanied Brown, Brown's mother, and Brown's sister, Jamella Wright, to the office of Brown's attorney. There, he signed a written statement prepared by Brown's attorney, the statement averred that he did not know Brittany, and that Brown had never been to his apartment with a female. At trial, Jeremy stated that he signed the prepared statement to help Brown.
 {¶ 14} Ashley testified that Jeremy invited her to his apartment and she went with her two friends Brittany and Kristin. She stated that Brown and Brittany were in Jeremy's bedroom alone. She stated the bedroom door was closed and the music was loud, but not very loud.
 {¶ 15} The victim, fifteen-year old Brittany, testified that in July 2004, she accompanied Ashley to Jeremy's apartment, where she met Brown. Brittany stated that they were all sitting in Jeremy's bedroom listening to music and playing video games. Brittany testified as follows regarding the sequence of events:
{¶ 16} "Q. Okay. What happens after that?
 {¶ 17} "A We sat in there for a little bit, and then Ashleyand Jeremy went out into the living room. Ish followed them. Ijust sat in the bedroom. I just thought everyone was going to becoming back in. And then after that, only Ish came back into theroom.
 {¶ 18} Q "Were you talking to Ish before just Ish came backinto the room? Were you speaking to him before that point?
 {¶ 19} "A Yes. First, he was just asking like about me, like what my name was, how old was I. I told him my name was Brittany. I was 15. I asked — I didn't ask him what his name was, but then, he started asking me, like, do you want to get raw, are you a virgin. I told him I was a virgin and I didn't want to get raw with him.
{¶ 20} "Q What did the word raw mean to you?
 {¶ 21} "A I didn't know what it meant at first. I kind of tookit as have sex."
 {¶ 22} "* * *
 {¶ 23} "Q. So you end up in the bedroom together. What happens— what happens after that?
 {¶ 24} "A. Um, well, after he was — he started asking me thesame questions as he was before. Do you want to get raw, thingslike that.
 {¶ 25} "Q He's asking you again, the same questions, do youwant to get raw?
 {¶ 26} "A Yes.
 {¶ 27} "Q And what else did he tell you, if you recall?
 {¶ 28} "A He asked me if I wanted to have sex.
 {¶ 29} "Q Is that — do you recall, is that the language thathe used, or if you remember?
 {¶ 30} "A No, sir, I can't remember exactly what he said, butI do know he asked me if I wanted to have sex.
 {¶ 31} "Q What did you reply?
 {¶ 32} "A I said no. And he asked if we could just do it alittle bit.
 {¶ 33} "Q What did you reply to that?
 {¶ 34} "A No. But that's when he got on top of me.
 {¶ 35} "Q How does he get on top of you?
 {¶ 36} "A Well, he started like pulling the blankets over me,and he was putting them over himself, as he said, like can wejust do it for a little bit? And then he started moving my shortsaway.
 {¶ 37} "Q What was your response to that?
 {¶ 38} "A I said no. And then while he was moving my shortsover, he started to stick his penis in me, and I tried pushinghim away a little bit, like nudging him.
 {¶ 39} "Q And what did he do after that?
 {¶ 40} "A He stuck his penis in me.
 {¶ 41} "Q What happened after that?
 {¶ 42} "A Um, he started to have sex with me, and I was tryingto nudge him off, because I was scared. I didn't really know whatto do. And then maybe two minutes into it, he asked me if Iwanted to stop, and I said yes. And he said, hold on, I'm almostdone. And he kept going for about another five minutes.
 {¶ 43} "Q How many times do you think you told him no?
 {¶ 44} "A Probably three or four.
 {¶ 45} "Q And how did this — what happened after that?
 {¶ 46} "A When he stopped, he ejaculated on me.
 {¶ 47} "Q Can you tell the jury what happened and whatejaculated on me means?
 {¶ 48} "A He ejaculated on my vagina after he pulled it out ofme."[3]
 {¶ 49} Brittany testified that after that day, she felt sad, alone, and depressed. She stated that she did not tell her parents about the rape until November 2004, when she was rushed to the hospital after taking five prescription Adderall pills at school, and suffering an adverse reaction.
 {¶ 50} On April 14, 2005, the jury found Brown guilty of rape, but not guilty of kidnapping. On May 17, 2005, prior to sentencing, Brown moved for a new trial, which the Court denied. The trial court then sentenced Brown to a nine-year prison term.
 Disclosure of Medical Records {¶ 51} In the first assigned error, Brown argues the trial court erred when it denied him access to the victim's medical records from the date she first accused him of rape. We disagree.
 {¶ 52} Crim.R. 16(B)(1)(d) provides as follows:
{¶ 53} "Reports of examinations and tests. Upon motion of thedefendant the court shall order the prosecuting attorney topermit the defendant to inspect and copy or photograph anyresults or reports of physical or mental examinations, and ofscientific tests or experiments, made in connection with theparticular case, or copies thereof, available to or within thepossession, custody or control of the state, the existence ofwhich is known or by the exercise of due diligence may becomeknown to the prosecuting attorney."
 {¶ 54} In the instant case, the record reveals that Brittany was treated for an overdose. While at the hospital, she told the social worker and her parents that she had been raped four months ago. As a result of this disclosure, a criminal investigation ensued, which led to Brown being charged with rape and kidnapping. Upon careful consideration of the record of proceedings in this case and the law, we conclude that the State did not fail to provide discovery information required under Crim.R. 16(B)(1)(d). As to the hospital records from Brittany's treatment for a drug overdose four months after the alleged rape, Crim.R. 16(B)(1)(d) requires the prosecuting attorney to permit the defendant to have access to such documents if they were made in connection with the particular case. The documents in question clearly were the result of a treatment for a drug overdose. The State indicated that although Brittany disclosed that she was raped four months earlier, she was not treated for the rape. Specifically, a rape kit was not performed.
 {¶ 55} The State also indicated that it had provided Brown's defense counsel with full discovery pertaining to the hospital treatment, and also indicated to the Court that the State would not be presenting any medical evidence.
 {¶ 56} Finally, in denying Brown's motion to permit inspection of the medical records related to the rape, the Court stated "Mr. Lentz just told me, as an officer of the court, and on the record, that they will be presenting no medical evidence. So there is no medical evidence being presented to the Court, so therefore, how can I force them to give you what does not exist."[4]
 {¶ 57} Our review of the record reveals that the State presented no medical evidence pertaining to the rape. We find, therefore, that the State did not violate Crim.R. 16(B)(1)(d). Accordingly, we overrule the first assigned error.
 Pretrial Identification {¶ 58} In the second assigned error, Brown argues the trial court erred in permitting pretrial identification evidence that was impermissibly suggestive and unreliable. We disagree.
 {¶ 59} Generally, identification testimony is properly admitted unless the identification procedure was so impermissibly suggestive that there was a substantial likelihood of irreparable misidenti-fication.[5] The court must consider the totality of the circumstances surrounding the identification.[6] InNeil v. Biggers,[7] the United States Supreme Court set forth the following factors to be considered in examining an identification procedure and its impact:
{¶ 60} "* * * Whether under the `totality of thecircumstances' the identification was reliable even though theconfrontation procedure was suggestive. As indicated by ourcases, the factors to be considered in evaluating the likelihoodof misidentification include the opportunity of the witness toview the criminal at the time of the crime, the witness' degreeof attention, the accuracy of the witness' prior description ofthe criminal, the level of certainty demonstrated by the witnessat the confrontation, and the length of time between the crimeand the confrontation. * * *"[8]
 {¶ 61} Before the out-of-court identification testimony is suppressed, the trial court must find that the procedure employed was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification.[9] Moreover, although the identification procedure may have contained notable flaws, this factor does not, per se, preclude the admissibility of the identification.[10] Thus, although the identification procedure is suggestive, as long as the challenged identification itself is reliable, it is admissible.[11]
 {¶ 62} Where a suspect has been confronted by a witness before trial, that witness' identification of the suspect will be suppressed if the confrontation procedure was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the totality of the circumstances.[12] The required inquiry is, therefore, two-pronged. The first question is whether the initial identification procedure was unnecessarily or unduly suggestive. Merely because a specific procedure is unnecessarily suggestive does not per se render the challenged identification inadmissible.[13] The second question is whether the out-of-court suggestive procedure created a very substantial likelihood of misidentifica-ion.[14]
 {¶ 63} In the instant case, Brown contends the photo array was impermissibly suggestive because Brittany was shown a photo of Brown's brother the day before she viewed the array. We are not persuaded.
 {¶ 64} The following exchange took place at trial:
{¶ 65} "Q. Do you recall being shown a photo by thedetective?
 A. Yes.
 {¶ 66} All right. And this is on the 23rd. Showing you what'sbeen marked as State's Exhibit 2, is that the photo that you wereshown?
 {¶ 67} Yes.
 {¶ 68} And who is that in the photo?
 {¶ 69} That's his brother Prince.
 {¶ 70} All right. And you recognize Prince Brown when you sawthe photo?
 {¶ 71} No, sir. When I saw it, he asked me if it was him. Isaid, no. It looked like him, but it's not him. And he told mewell, that's his brother; we don't have the picture of Ish yet.
 {¶ 72} Okay. And did you end up — you end up going back to thestation the next day, didn't you?
 {¶ 73} Yes.
 {¶ 74} And do you recall the detective showing you a photolineup, at that point?
 {¶ 75} Yes.
 {¶ 76} Okay. Showing you what's been marked as State's Exhibit3, can you identify this for the jury? Tell them what thatshows.
 {¶ 77} Who does that show?
 {¶ 78} Well, is that the photo array that you were shown bydetective Connor?
 {¶ 79} Yes.
 {¶ 80} And when you were shown that photo array, did yourecognize anybody from the six individuals pictured there?
 {¶ 81} I recognized Ish.
 {¶ 82} Okay. Did you have any problem identifying Ish.
 {¶ 83} No."[15]
 {¶ 84} It is clear from the above excerpt that the identification procedure was not suggestive. When Brittany was shown the picture of Brown's brother, she stated that it looked like him, but it was not him. The following day, Brittany identified Brown from a photo array of six individuals.
 {¶ 85} Detective Connor of the Parma Police Department testified as follows regarding the investigation:
{¶ 86} "A. I didn't have much. When I showed the photograph toher, all she stated to me was that, that looks similar to theoffender, but that's not him.
 {¶ 87} And upon speaking with Brittany, did she know — whatdid she know about the offender?
 A. I'm not sure exactly what you're asking.
 {¶ 88} Was she able to give the name to the Parma PoliceDepartment?
 {¶ 89} Correct. She said the offender's name wasIsh."[16]
 {¶ 90} There is no indication from the above excerpt that Brittany was influenced by the picture of Brown's brother.
 {¶ 91} It is also clear that Brittany's identification was reliable. Brittany spent a significant amount of time with Brown prior to the rape. Jeremy, Ashley and Brittany testified that they were all sitting around listening to music and playing video games. In addition, Brittany testified that Brown engaged her in conversation prior to the rape. Brown asked her if she was a virgin and repeatedly asked if she wanted to have sex. Finally, Brittany testified that she was on her back facing Brown during the rape, which lasted approximately five to seven minutes.
 {¶ 92} Based on the record before us, we conclude that the identification was neither impermissibly suggestive, nor was it unreliable. Accordingly, we overrule the second assigned error.
 Defendant's Right to Compulsory Process {¶ 93} In the third assigned error, Brown argues the trial court erred by failing to issue a warrant to secure the testimony of his brother, Prince Brown, a subpoenaed witness. We disagree.
 {¶ 94} Few rights are more fundamental than the right of an accused to present witnesses on his behalf.[17] Although we agree with Brown that the Court is required to take some action in order to ensure that an accused's right to compulsory process is protected,[18] we conclude that the actions of the trial court herein did not violate Brown's rights.
 {¶ 95} In the instant case, Brown's defense counsel subpoenaed Prince Brown, believing him to be a material witness. Prior to trial, the following exchange took place after Brown moved the Court to issue a warrant to secure his brother's attendance at trial:
{¶ 96} "Mr. Day: We have a material witness who has beenconveniently A.W.O.L. on trial days.
 {¶ 97} The Court: Basically, what you're trying to do is getme a motion to continue.
 {¶ 98} Mr. Day: Not necessarily. I think we should grant amotion for capias, which I have here.
 {¶ 99} The Court: What is your legal reason for opposing,other than you're not ready for trial.
 {¶ 100} Mr. Day: I'm ready. I was ready last Wednesday.
 {¶ 101} The Court: I thought you said we have a materialwitness that's not available.
 {¶ 102} Mr. Day: We may have a few others. I think, if we havea few days or weeks we might have a higher probability of gettinghim here."[19]
 {¶ 103} Here, defense counsel did not request a continuance to ascertain Prince Brown's whereabouts, nor did he provide any assurances that his presence could be compelled. Instead, defense counsel represented to the court that he was ready for trial.
 {¶ 104} To establish a violation of the Sixth Amendment right of compulsory process or the Fifth Amendment right to due process, the accused must show that the omitted testimony would have been both material and favorable to his defense.[20]
The requirement that the omitted testimony be "material" to the defense "reflects [an] overriding concern with the justice of the finding of guilt." Thus, the omitted testimony "must be evaluated in the context of the entire record," and neither the Sixth nor the Fifth Amendment is implicated if, upon consideration of the omitted testimony, there remains "no reasonable doubt about guilt."[21]
 {¶ 105} At trial, defense counsel argued that it was Prince Brown who was present at Jeremy's apartment on the day in question. However, the record reveals that three witnesses, including Brittany, testified that it was Brown, and not his brother, Prince, who was present at Jeremy's apartment that day.
 {¶ 106} Moreover, relevant to defense counsel's theory of mistaken identity, the following exchange to place:
{¶ 107} "Mr. Lentz: The defense has talked about Prince beingthe person that did this.
 {¶ 108} The Court: The Court's aware of that, because Ishmaelstood in front of the court wanting to fire Mr. Day, one of theissues was, he didn't want to pin it on his brother, and he'sclaiming he was innocent. So, I knew back then that there hadbeen some discussion between counsel and his client as toindicating that Prince did it, and he didn't do it becauseIshmael told the Court that he didn't agree with that tactic. SoI am aware of it."[22]
 {¶ 109} The above excerpt indicates that Brown opposed the position that is now being argued before this court. We conclude that the trial court did not violate Brown's rights to compulsory process. Accordingly, we overrule the third assigned error.
 Motion for Acquittal {¶ 110} In the fourth assigned error, Brown argues the State failed to present sufficient evidence to sustain his conviction for rape and, therefore, the trial court should have granted his motion for acquittal. We disagree.
 {¶ 111} Crim.R. 29(A) provides, in part:
{¶ 112} "The court on motion of a defendant or on its ownmotion, after the evidence on either side is closed, shall orderthe entry of a judgment of acquittal of one or more offensescharged in the indictment, information, or complaint, if theevidence is insufficient to sustain a conviction of such offenseor offenses."
 {¶ 113} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.[23]
 {¶ 114} In the instant case, Brown contends that the State failed to satisfy the degree of proof necessary to establish that he was the offender. The record before us belies this assertion. Two witnesses, Jeremy and Ashley, plus the victim, testified that Brown was present in the apartment on the day in question. Jeremy admitted that, in an attempt to help Brown, he signed the written statement that was prepared by Brown's attorney, which stated that Brown was not at the apartment that day. Ashley testified that Brown was present at the apartment and that they were sitting in Jeremy's bedroom listening to music and playing video games. Both Jeremy and Ashley testified that Brown and Brittany were alone in the bedroom, with the door closed and the music playing.
 {¶ 115} Brittany testified in detail about the encounter with Brown, which led to her being raped, and as previously discussed, Brittany's identification of Brown was reliable. As set forth above, the test regarding the sufficiency of evidence is not whether the testimony is to be believed, but whether, if believed, the evidence would support a conviction. The testimony of Jeremy, Ashley and Brittany, if believed, was sufficient to demonstrate that Brown committed the crime of rape. Moreover, viewing the evidence in a light most favorable to the prosecution, it is apparent that the State presented sufficient evidence to support Brown's rape conviction. Accordingly, we overrule the fourth assigned error.
 Manifest Weight {¶ 116} In the fifth assigned error, Brown argues his conviction was against the manifest weight of the evidence. We disagree.
 {¶ 117} While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenge questions whether the State has met its burden of persuasion.[24]
When a defendant asserts that his conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[25]
 {¶ 118} In the instant case, Brittany provided significant, descriptive and testimonial evidence that Brown was the person who was at Jeremy's apartment on the day in question. Brittany gave graphic testimony of the rape, and the conversation which preceded the offense. Consequently, after reviewing the entire record, weighing the evidence, and considering the credibility of the witnesses, we are not persuaded that the jury clearly lost its way or created such a miscarriage of justice that Brown's convictions must be reversed. Accordingly, we overrule the fifth assigned error.
 Motion for New Trial {¶ 119} In the sixth assigned error, Brown argues the trial court erred when it denied his motion for a new trial. We disagree.
 {¶ 120} The decision to grant or deny a motion for a new trial is within the sound discretion of the trial court and, absent an abuse of discretion, that decision will not be disturbed.[26]
 {¶ 121} On May 2, 2005, Brown filed a motion for a new trial on grounds that included the trial court's alleged ruling, which limited defense counsel's access and assistance from his paralegal during trial. In the motion for new trial, Brown's defense counsel averred that the trial court imposed the ruling because the retained paralegal is labeled a sexual predator. A review of the record before us reveals the following reference to Brown's paralegal:
{¶ 122} "Mr. Day: Helping me in this case is James Sullivan,private paralegal, who knew Ishmael prior to this case. You mayhave seen him here this morning.
 {¶ 123} "* * *
 {¶ 124} "Mr. Day: The other person, you may see themapproaching, is my assistant Jenny Levy."[27]
 {¶ 125} An exhaustive review of the record before us reveals that the above excerpt is the sole reference to Brown's defense counsel's paralegal and assistant. The record is devoid as to the trial court's alleged ruling limiting defense counsel's access and assistance from his paralegal during trial.
 {¶ 126} Brown's alternate grounds for the motion for a new trial was the trial court's refusal to issue a warrant to secure the attendance of his brother, Prince Brown, at trial. We have addressed this issue in the third assigned error, and we concluded that the trial court did not err in its refusal to issue the warrant. Accordingly, we overrule the sixth assigned error.
 Sentencing {¶ 127} In the seventh assigned error, Brown argues that his sentence is contrary to law. We conclude that this case is controlled by the Ohio Supreme Court's decision in State v.Foster. In Foster, the Court held that R.C. 2929.14(B) violates the Sixth Amendment to the United States Constitution, pursuant to Blakely v. Washington,[28] and Apprendi v.New Jersey.[29] As a result, defendants who were sentenced under this unconstitutional and now void statutory provision must be resentenced.[30]
 {¶ 128} Accordingly, pursuant to the mandates of Foster, we sustain Brown's seventh assigned error, vacate his sentence, and remand the matter to the trial court for resentencing.
 {¶ 129} This matter is affirmed as to the jury's verdict finding Brown guilty of rape; sentence vacated and case remanded for resentencing.
It is ordered that appellant and appellee share the costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Cooney, P.J., and Calabrese, Jr., J., Concur.
[1] 109 Ohio St.3d 1, 2006-Ohio-856.
[2] In order to protect the identity of the minors referenced herein, they will be referred to by their first names.
[3] Tr. at 350-357.
[4] Tr. at 27.
[5] See Simmons v. United States (1968), 390 U.S. 377,88 S.Ct. 967, 19 L.Ed.2d 1247; State v. Barnett (1990),67 Ohio App.3d 760; State v. Hill (1987), 37 Ohio App.3d 10.
[6] See Stovall v. Denno (1967), 388 U.S. 293, 87 S.Ct. 1967,18 L.Ed.2d 1199; Foster v. California (1969), 394 U.S. 440,89 S.Ct. 1127, 22 L. Ed.2d 402; United States v. Burgos (C.A.4, 1995), 55 F.3d 933; State v. Fanning (1982),1 Ohio St.3d at 20, citing State v. Jackson (1971), 26 Ohio St.2d 74, paragraph two of the syllabus.
[7] Neil v. Biggers, (1972), 409 U.S. 188, 93 S.Ct. 375,34 L.Ed.2d 401.
[8] See, also, State v. Jells (1990), 53 Ohio St.3d 22, 27.
[9] See Barnett, supra. See, also, State v. Hill,37 Ohio App.3d at 14; State v. Blackwell (1984), 16 Ohio App.3d 100.
[10] See State v. Merrill (1984), 22 Ohio App.3d 119, 121;State v. Moody (1978) 55 Ohio St.2d 64, 67.
[11] See Manson v. Brathwaite (1977), 432 U.S. 98,97 S.Ct. 2243, 53 L.Ed.2d 140; Moody, supra.
[12] See State v. Brown (1988), 38 Ohio St.3d 305, 310.
[13] See Manson, supra, and Moody, supra; Merrill,
supra.
[14] See Simmons v. United States, supra.
[15] Tr. at 366-367.
[16] Tr. at 393-394.
[17] Taylor v. Illinois (1988), 484 U.S. 400, 408,108 S.Ct. 646, 652, 98 L.Ed.2d 798, 810.
[18] State v. Brown (1992), 64 Ohio St.3d 649, 652.
[19] Tr. at 17.
[20] See United States v. Valenzuela-Bernal (1982),458 U.S. 858, 868-873, 102 S.Ct. 3440, 73 L.Ed.2d 1193.
[21] See Id. at 874, 102 S.Ct. 3440 (quoting United States v.Agurs [1976], 427 U.S. 97, 112-113, 96 S.Ct. 2392,49 L.Ed.2d 342).
[22] Tr. at 23-24.
[23] State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
[24] Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52.
[25] State v. Glass, Cuyahoga App. No. 81607, 2003-Ohio-879, citing State v. Otten (1986), 33 Ohio App.3d 339, 340.
[26] State v. Hawkins (1993), 66 Ohio St.3d 339, 350, citingState v. Petro (1947), 148 Ohio St. 505, syllabus.
[27] Tr. at 117-118.
[28] (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403.
[29] (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435.
[30] Foster, 109 Ohio St.3d 1, 2006-Ohio-856, ¶¶ 103-106.