[Cite as *State v. Jackson*, 2018-Ohio-1633.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 105919

---

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**EMMANUEL JACKSON**

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-608044-C

**BEFORE:** Keough, J., E.A. Gallagher, A.J., and Boyle, J.

**RELEASED AND JOURNALIZED:** April 26, 2018

**ATTORNEY FOR APPELLANT**

Mark R. Marshall
P.O. Box 451146
Westlake, Ohio 44145


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
By: Kevin E. Bringman
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113


KATHLEEN ANN KEOUGH, J.:

{¶1}     Defendant-appellant, Emmanuel Jackson, appeals from the trial court's judgment, rendered after a jury trial, finding him guilty of aggravated robbery, robbery, grand theft, theft, and kidnapping, and sentencing him to 16 years in prison. Although the state improperly conditioned the plea agreements of Jackson's codefendants on their agreement not to testify at Jackson's trial, on the facts of this case, we affirm.

## I.   Facts and Procedural Background

{¶2}     Jackson and two codefendants, Anthony Palmentera and Bradley Lease, were indicted in an 11-count indictment with aggravated robbery, robbery, grand theft, theft, and kidnapping. Jackson and Lease were also indicted for having weapons while under disability.

Some of the counts contained firearm, notice of prior conviction and repeat violent offender specifications.

{¶3}    The testimony at trial demonstrated that the indictments arose out of an incident that occurred outside the Peek-A-Boo nightclub in the early morning hours of July 13, 2016. The victim, Kenneth Mayock, drove a borrowed minivan to the club to pick up a friend who worked there.   Mayock testified that three men approached the van as he waited in the parking lot of the club.   Two of the men were white; the other was African American and later identified as Jackson.

{¶4}    Mayock said that the African American male approached the driver's side of the van, reached in, grabbed him by his hoodie, and demanded his money.   Mayock said he gave the man his wallet, but the man pulled him out of the van, pushed him to the ground, and threatened to shoot him.   Mayock testified that this man and the other men then hit him and again threatened to shoot him.   The three men eventually drove off in the minivan, leaving Mayock on the ground.   Mayok's iPhone was in the minivan.

{¶5}    Mayock ran into the nightclub and asked the bartender to call 911.   Mayock then called his mother and asked her to track his cell phone on the Find My iPhone application on her phone.   Cleveland police officers soon arrived at the nightclub and interviewed Mayock, who gave them a description of the minivan and the three men, including a description of a tattoo on the African American male's right arm, which Mayock had observed when the male reached through the van window and grabbed him.

{¶6}    Cleveland police officer Courtney Evans was one of the officers who responded to the scene and interviewed Mayock.   She testified that within 20 to 30 minutes after arriving, the officers learned the general location of the minivan and Mayock's cell phone from Mayock's

mother, who was tracking the phone. The officers relayed this information to police officers in the area, who began touring the area looking for the van and the suspects.

**{¶7}** Within a short time, those officers found the van and three suspects, one of whom was Jackson, who matched the descriptions given by Mayock. The officers found Mayock's cell phone in the grass about ten feet away from where they apprehended Jackson. The police then transported Mayock to that location, and Mayock identified all three individuals in a "cold stand" identification as the individuals who had assaulted and robbed him earlier that night.

**{¶8}** Cleveland police officer Michael Keane testified at trial that he was one of the officers who found the abandoned van, as well as a pair of black and white sandals on the ground about five feet from the van. Keane testified that Jackson, who was not wearing any shoes or socks, denied knowing the two men arrested with him, but admitted that the sandals near the van were his.

**{¶9}** Cleveland police detective Jeffrey Grabski was assigned to investigate. During Det. Grabski's videotaped interview of Jackson, which was played for the jury, Jackson told Det. Grabski that he had been drinking at Henry's Bar in Cleveland that night, and later went to a friend's house on Oakley Avenue. Jackson denied knowing Palmentera and Lease, although Palmentera lived on Oakley Avenue and during his interview, Jackson referred to Lease as "John," which is Lease's middle name and the name he uses.

**{¶10}** The jury found Jackson guilty of aggravated robbery, robbery, grand theft, and kidnapping. The jury also found him guilty of the notice of prior conviction and repeat violent offender specifications attached to those counts, although it did not find him guilty of any firearm specifications.

**{¶11}** The trial court merged the counts for sentencing, and the state elected to proceed to sentencing on Count 2, aggravated robbery. The trial court sentenced Jackson to 11 years incarceration on the aggravated robbery count, consecutive to five years on the repeat violent offender specification. This appeal followed.

## II.   Law and Analysis

**{¶12}** On the morning of trial, Jackson, Palmentera, Lease, and their lawyers appeared before the trial judge. The prosecutor then outlined the state's plea offer, which was a "package deal," meaning all three defendants had to agree to plead guilty. The prosecutor stated that if the defendants pleaded guilty to Count 4, robbery, and Count 6, grand theft of a motor vehicle, the state would nolle the accompanying one-and three year firearm specifications attendant to those counts, as well as the notice of prior conviction and repeat violent offender specifications on Count 4 particular to Jackson. The prosecutor further stated that Jackson and Lease would be expected to plead guilty to Counts 9 and 10, respectively, having weapons while under disability. The prosecutor stated that in exchange for the defendants' guilty pleas, the state would dismiss the remaining charges.

**{¶13}** The trial judge reviewed the plea offer with the three defendants and their counsel. All counsel stated that the prosecutor's recitation was consistent with their understanding of the plea offer. All three defendants told the court they were declining the plea offer and would go to trial.

**{¶14}** After voir dire, a jury was seated and then dismissed for lunch. The record reflects that immediately after lunch, Palmentera and Lease entered into plea agreements with the state. The plea agreements were identical to those set forth by the prosecutor immediately before trial but contained two additional provisions: (1) the defendants agreed to have no contact with the

victim, and (2) as the prosecutor told the trial judge, "they also agree not to come in and testify on behalf of Emmanuel Jackson during the pendency of his trial." The record reflects that Jackson and his trial counsel were not present for this plea hearing.

{¶15} In his single assignment of error, Jackson argues that the state violated his constitutionally protected right to compulsory process by entering into plea agreements with Palmentera and Lease that barred them from testifying as witnesses for the defense at his trial.

{¶16} Initially, we reject the state's assertion that Jackson waived this argument by not raising it in the trial court. There is no indication in the record that either Jackson or his counsel were aware that Lease and Palmentera's plea agreements included a condition that they not testify at his trial. Neither Jackson nor his counsel were at his codefendants' plea hearings. Moreover, when the prosecutor outlined the state's plea offer immediately prior to trial, when Jackson and his counsel were present, the prosecutor made no mention whatsoever of conditioning any individual plea agreement on not testifying for the other codefendants. There is nothing in the record demonstrating that Jackson and his counsel were ever told that the state had added such a condition to Lease and Palmentera's plea agreements. Thus, there is no reason on this record to conclude that Jackson knew that Lease and Palmentera were precluded from testifying on his behalf, and that he therefore should have raised the issue in the trial court.

{¶17} The Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution preserve to an accused the right to present witnesses in his defense and to compel their attendance at trial. *State v. McIntosh*, 1st Dist. Hamilton No. C-020593, 2003-Ohio-3824, ¶ 17, citing *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's

version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington* at *id*. "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Id.*

{¶18} Accordingly, "governmental impairment of the accused's ability to call witnesses on his behalf cannot be tolerated." *United States v. Bell*, 506 F.2d 207, 222 (D.C. Cir.1974). Thus, in *Washington*, the United States Supreme Court held that a state procedural statute that precluded persons charged as principals, accomplices, or accessories in the same crime from testifying as witnesses for each other denied the defendant his Sixth Amendment right to compulsory process for obtaining witnesses in his favor because the statute operated to exclude the relevant and material testimony of a co-conspirator.

{¶19} Similarly, in *State v. Henricksen*, 564 F.2d 197 (5th Cir.1997), the court reversed the defendant's conviction and remanded for a new trial where a codefendant refused to testify for the defense after entering into a plea agreement with the state in which he agreed not to testify for the defendant, and the government stated the agreement would be void if he so testified. The principle underlying these and similar cases is that "the refusal of a defense witness to testify must be voluntary, and the state may not prevent a witness from testifying for the defendant." *State v. Fort*, 101 N.J. 123, 130, 501 A.2d 140 (1985).

{¶20} In this case, there is no question the state improperly precluded Lease and Palmentera from testifying on Jackson's behalf at his trial by prohibiting such testimony as a condition of their plea agreements. The trial court likewise improperly precluded Lease and Palmentera's testimony by accepting pleas that included such a condition.

{¶21} However, to establish a violation of the right to compulsory process, even where the government's actions have precluded a witness from testifying, a defendant must make some plausible showing of how the witness's testimony would have been both material and favorable to his defense. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); *State v. Brown*, 8th Dist. Cuyahoga No. 86544, 2006-Ohio-2573, ¶ 104. The omitted testimony "must be evaluated in the context of the entire record," and the Sixth Amendment is not implicated if, upon consideration of the omitted testimony, there remains no reasonable doubt about guilt. *Brown* at ¶ 104.

{¶22} Jackson does not specify to what Palmentera and Lease would have testified, but contends that the state's action in obtaining plea agreements with them that precluded them from testifying for the defense demonstrates a "reasonable probability" that their testimony would have been helpful to his defense. He also contends that, in any event, he was precluded from learning how Palmentera and Lease would have testified because they were motivated against providing him with any assistance to avoid the possibility their plea deals would be rescinded.

{¶23} But more than "the mere absence of testimony" is necessary to establish a violation of the right to compulsory process. *Valenzuela-Bernal*, 458 U.S. at 867. And the fact that the defendant cannot interview the witnesses does not relieve the defendant of his burden to demonstrate materiality. *Id*. at 870, 873. In determining whether the omitted testimony would have been material and favorable to the accused, "courts should afford some leeway for the fact that the defendant necessarily proffers a description of the material evidence rather than the evidence itself." *Id.* at 874. Additionally, the defendant cannot be expected to render a detailed description of the lost testimony. *Id.* But even where the defendant has not had an opportunity

to interview witnesses, the materiality requirement is not dispensed with completely. *Id.* As

the United States Supreme Court stated in *Valenzuela-Bernal*:

> [W]hile a defendant who has not had an opportunity to interview a witness may face a difficult task in making a showing of materiality, the task is not an impossible one. In such circumstances it is of course not possible to make any avowal of how a witness may testify. But the events to which a witness might testify, and the relevance of those events to the crime charges, may well demonstrate either the presence or absence of the required materiality.

*Id.* at 871.

{¶24} In this case, Jackson does not explain what material, favorable evidence

Palmentera and Lease would have provided for his defense. At least a "plausible theory" of how

the testimony of the missing witnesses would be helpful to the defense must be offered, however.

*Valenzuela-Bernal*, 458 U.S. at 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193.

{¶25} Jackson's reliance on *McIntosh*, 1st Dist. Hamilton No. C-020593,

2003-Ohio-3824, to overturn his conviction is misplaced. In *McIntosh*, the appellate court

remanded for an evidentiary hearing on the defendant's postconviction petition, in which he

alleged that the state had denied him his right to compulsory process by entering into plea

agreements with coindictees that precluded them from testifying for the defense, and that his

attorney was ineffective for not subpoenaing the coindictees to testify at trial. The court noted

that McIntosh had not supported his petition with the substance of the coindictees' likely

testimony to demonstrate how their testimony would have been material and favorable to the

defense, *id.* at ¶ 20, but found that this failure was because the right to compel their testimony

was denied McIntosh at trial and in the initial stages of the postconviction proceeding. *Id.* at ¶

21. The court concluded that the "problems of proof" demanded a thorough examination of the

claims at an evidentiary hearing. *Id.*

{¶26} *McIntosh* is distinguishable from this case. In *McIntosh*, the defendant moved to sever his trial from his coindictees, arguing that their testimony was "crucial" to his defense. *Id.* at ¶ 12. The trial court denied the motion when the prosecutor assured the court that all of the coindictees would be available to testify, despite their guilty pleas. *Id.* Later, the defendant moved for a mistrial, arguing that the state had committed prosecutorial misconduct by making plea agreements with his coindictees that precluded their testimony for the defense. *Id.* at ¶ 14. The prosecutor initially denied that the plea agreements precluded testimony favorable to the defense. Then, when confronted with a letter from counsel to the prosecutor outlining the terms of the plea agreement with one of the coindictees, the prosecutor denied that the provision precluding defense testimony was at the state's suggestion, and assured the court that the witnesses could be subpoenaed and brought before the court. *Id.* at ¶ 15. The trial court denied the motion for a mistrial based upon the prosecutor's assurances that the coindictees were available to testify. *Id.* But a letter subsequently submitted with the defendant's postconviction petition demonstrated that despite the prosecutor's denials, the prosecutor was actively involved in procuring plea agreements that prevented the coindictees from testifying for the defense. *Id.* at ¶ 16. In light of these events, the court determined that the trial court had erred in denying the defendant's postconviction petition without a "thorough examination" of the claims at an evidentiary hearing. *Id.* at ¶ 21.

{¶27} The type of egregious conduct set forth in *McIntosh* did not occur in this case. And unlike *McIntosh*, Jackson did not raise the compulsory process issue in the trial court or seek to obtain his codefendants' testimony. Likewise, on appeal, he does not set forth any theory regarding how their testimony would have been material and favorable to his defense. Accordingly, he has failed to meet his burden of demonstrating a Sixth Amendment violation.

{¶28} Moreover, after evaluating the entire record, we are satisfied that, despite the state's improper conduct in suppressing Lease and Palmentera's testimony, the evidence presented at trial overwhelmingly established Jackson's participation in the events of July 13, 2016. Jackson and his codefendants were apprehended only a short time after the robbery based on descriptions provided by Mayock. During the cold stand identification, Mayock identified Jackson as one of the three men who had assaulted and robbed him. At trial, Mayock identified the tattoo on Jackson's right arm, which Jackson showed to the jury, as the same tattoo Mayock observed when the African American male reached through the van window and grabbed him. Mayock's iPhone, which was in the minivan when the three males drove away, was recovered on the ground about ten feet away from where Jackson was apprehended, and Jackson's sandals were found only a few feet away from the van. And although Jackson denied knowing Palmentera and Lease, during his interview with Det. Grabski, Jackson referred to Lease as "John," the name by which Lease is known. In light of this evidence, there is no reasonable doubt about Jackson's guilt. Palmentera and Lease's testimony would not have changed the outcome of the trial. *See Brown*, 8th Dist. Cuyahoga No. 86544, 2006-Ohio-2573, ¶ 104 (Sixth Amendment not implicated if there remains no reasonable doubt about guilt).

{¶29} Accordingly, we overrule the assignment of error and affirm Jackson's conviction. We note, however, that although we affirm in this case, our decision could be otherwise in another case where, in the context of the entire record, the testimony suppressed by the state through a plea agreement that precludes witnesses from testifying for the defense could have changed the result of the trial. We remind the state that a trial, "although inevitably an adversarial proceeding, is above all else a search for truth. That quest is better served when the

state does not suppress the truth by sealing the lips of witnesses." *Fort*, 101 N.J. 123 at 131, 501 A.2d 140.

{¶30} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, JUDGE

EILEEN A. GALLAGHER, A.J., and
MARY J. BOYLE, J., CONCUR