JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Ramone Glover ("defendant"), appeals from his convictions and sentence following his third trial on charges related to robberies that took place on July 10th and July 15th, 2003. For the following reasons, we affirm.
 {¶ 2} Defendant was indicted on one count of robbery and one count of aggravated robbery, with one-and three-year firearm specifications. The first trial commenced on October 28, 2003 and resulted in a hung jury. The State retried the matter on February 17, 2004, and defendant was convicted on both counts. He received a nine-year sentence and appealed. This Court vacated defendant's convictions and remanded for a new hearing on defendant's motion to suppress identifications of him and also ordered defendant to receive a new trial. See State v. Glover, Cuyahoga App. No. 84413, 2005-Ohio-1984 ("Glover I"). In Glover I, this *Page 3 
Court rejected defendant's contention that the trial court abused its discretion by denying his motion to sever the two counts of the indictment.
 {¶ 3} Following remand, both defendant and the State reincorporated all motions that were filed in the prior proceedings. Based on this Court's decision in Glover I, the trial court overruled defendant's motion to sever.
 {¶ 4} On May 4, 2006, the trial court conducted a hearing on defendant's motion to suppress and overruled it. After thorough discussion on the record, defendant declined plea offers and the promise of judicial release after seven more months of incarceration. Defendant acknowledged that he faced a potential sentence of twenty-one years; notwithstanding the nine-year sentence that was imposed following his second trial.
 {¶ 5} Detective David Volek testified at the pretrial hearing on the motion to suppress. He investigated the July 15, 2003 robbery at Lube Stop in South Euclid. He received a broadcast description of the suspect: "black male * * * light skinned, a mustache." Det. Volek recalled there was a robbery across the street a week earlier at the BP Station, which Detective Ardonetto was investigating. Det. Ardonetto had obtained an eyewitness identification of the BP robber.
 {¶ 6} Det. Volek took Det. Ardonetto's photo array with him to the Lube Stop to question the eyewitnesses. The photo array was admitted at the hearing as State's Exhibit 1. Det. Volek did not know who had been identified as the BP robber from the photo array at the time he went to investigate the Lube Stop robbery. *Page 4 
 {¶ 7} Det. Volek interviewed the two victims of the Lube Stop robbery within 15 minutes of the offense. Both victims described the suspect as a black male, thin, wearing a hoodie, and having a thin mustache. Det. Volek separated the two victims by approximately 25 feet and separately showed them the photo array. He told them the robber may or may not be pictured in the array. The first victim that was interviewed immediately identified defendant's photo as the robber. The second victim also readily identified defendant as the perpetrator.
 {¶ 8} A victim of the Lube Stop robbery, Mr. Bennett, also testified at the suppression hearing. Mr. Bennett was working with Prentiss Reddick at the Lube Stop on July 15, 2003 when a robbery occurred. He called the police and Det. Volek responded within five minutes. Mr. Bennett confirmed that Det. Volek showed him the photo array marked as State's Exhibit 1. Mr. Bennett confirmed that he had identified defendant's photograph as the robber by pointing at it. Det. Volek then went to talk to the other victim, Mr. Reddick. Mr. Bennett could not hear the discussion between Det. Volek and Mr. Reddick. Mr. Bennett then made an in-court identification of defendant.
 {¶ 9} On cross-examination, Mr. Bennett stated that the robber was wearing a white, cream-colored hoodie over his head. After he came inside, he took the hoodie off his head and Mr. Bennett believed he had braided hair. The individual also had a beard or mustache, was tall, thin, with a medium brown skin tone. He stated he could not really recall exactly how he described the offender as it *Page 5 
happened so long ago. Mr. Bennett further explained that people's skin tone can change with the season.
 {¶ 10} A victim from the BP Station robbery, Ms. Pinkston, then testified at the suppression hearing. She was employed at the BP Station when she was robbed on July 10, 2003. Ms. Pinkston was attempting to take money to the bank. A man accosted her in the parking lot of the store and took the bag of money. Her coworker called the police. A few days later, Det. Arornetto interviewed Ms. Pinkston and showed her the photo array identified as State's Exhibit 1. Det. Ardonetto asked her if the offender was in the array. She selected defendant's photo as being the person who robbed her on July 10, 2003. She verified that she identified defendant on July 14, 2003. She believed she described the person who robbed her as being dark skinned, about 150 lbs. and having braids. She doesn't recall any facial hair. On cross-examination, Ms. Pinkston confirmed that she had said defendant looked like the person who robbed her.
 {¶ 11} The State then presented the testimony of Lloyd Blankenship, who witnessed the robbery at the BP Station on July 10, 2003. At the hearing in 2006, Mr. Blankenship could not recall how he described the perpetrator to police in 2003. Mr. Blankenship identified two photos from State's Exhibit 1 as the possible suspect, one being defendant's photo. Mr. Blankenship stated that Det. Ardonetto wanted him to select a photograph so he picked the two that most resembled the robber he had observed. Mr. Blankenship confirmed on cross-examination that they may not *Page 6 
have been the offender he saw that day. Mr. Blankenship saw the individual for about 15 seconds from a distance of about 75 feet. Further, Mr. Blankenship did not make his statement to the police until November 2003.
 {¶ 12} The State concluded its evidence at the suppression hearing with the testimony of Det. Ardonetto. He put together the photo array marked as State's Exhibit 1. He had assembled between 100 and 200 photographic arrays over a 19-year period.
 {¶ 13} Det. Ardonetto took polaroid photographs of defendant and then prepared State's Exhibit 1 on July 12, 2003. He placed defendant's photo in position number five and then selected photos of persons with similar characteristics to complete the array. He then presented the victim from the BP station with the array. She identified defendant as the person who robbed her.
 {¶ 14} Det. Ardonetto identified defendant in court as the person depicted in position number five of the photo array marked as State's Exhibit 1.
 {¶ 15} The defense objected to the admission of the prior sworn testimony of Mr. Reddick[1] at the suppression hearing, which the trial court did exclude. *Page 7 
 {¶ 16} The trial court then found that the identification procedure was not impermissibly suggestive and denied defendant's motion to suppress the pre-trial identifications. The matter proceeded to trial for the third time.
 {¶ 17} At trial, the State presented the testimony of various victim eyewitnesses. The first witness, Mr. Bennett, testified as follows: He was the manager at the Lube Stop in South Euclid on July 15, 2003. That day, Mr. Bennett was working with Mr. Reddick. As they were closing the store around 7 p.m., a man walked towards one of the bay doors. Mr. Bennett let him inside. The man then pulled a handgun on him and demanded money. Either Mr. Bennett or the man threw Bennett's cellular phone into the pit.
 {¶ 18} There was a distance of approximately four feet between them. The robber wore a white or beige hooded sweatshirt and was about six feet tall. He was medium build, slim, and black. Mr. Bennett believed the individual was in his thirties. The man fled after Mr. Bennett and Mr. Reddick gave him approximately $600.00. Mr. Bennett said he saw the man "[a] long, long time." Mr. Bennett called police, who responded within five minutes. Det. Volek separated and interviewed each victim. Det. Volek showed Mr. Bennett a group of pictures from which Bennett identified defendant's photograph as the person who robbed the Lube Stop. Det. Volek then showed the photo array to Mr. Reddick.
 {¶ 19} Mr. Bennett also identified defendant in court as the person who robbed the Lube Stop on July 15, 2003. *Page 8 
 {¶ 20} On cross-examination, Mr. Bennett stated the robber had a hood over his head until he came inside. He was not sure of the color of the gun but believed it was a silver handgun. The whole incident took about two minutes. Mr. Bennett recalls testifying previously that the man was middle-aged. He said it was hard for him to guess a person's age. He, at times, described the man as having dark skin and at others as having a medium skin tone. He explained that he was not really sure about how to describe skin tone because "everybody have [sic] different opinions on different shades." He also recalls the man as having some facial hair.
 {¶ 21} Mr. Bennett confirmed that the robber touched the business phone and possibly his own cellular phone.
 {¶ 22} On re-direct, Mr. Bennett confirmed that he was certain that he correctly identified defendant as the man who robbed the Lube Stop.
 {¶ 23} The State next called Ms. Pinkston, who was the victim of the July 10, 2003 robbery at the South Euclid BP station. Ms. Pinkston was taking approximately $6,370 to deposit in the bank when a man asked her if she had a light. She observed the man as he approached her and she was trying to go back inside the building. The man grabbed her, took the bag of money and ran behind the building.
 {¶ 24} She observed him from a distance of about 11 feet, five inches. The man wore a red pull-over thin jacket.
 {¶ 25} Ms. Pinkston met with Det. Ardonetto on July 14, 2003. He presented her with a photographic array and asked her if the man who robbed her was among *Page 9 
the photos. She said yes, and identified defendant's photograph as the person who robbed her. She confirmed that on one occasion she commented to the prosecutor that defendant was the one who looked most like the person who robbed her.
 {¶ 26} Ms. Pinkston identified defendant in court as the person who robbed her.
 {¶ 27} On cross-examination, Ms. Pinkston stated the individual might have had braided hair. She believed the man had a mustache but may have testified previously that he did not. She attributed any discrepancy to the fact it had been three years since the incident occurred. She re-confirmed that she said defendant looked like the man that robbed her. Det. Ardonetto asked her whether the person who robbed her was depicted in the photo array.
 {¶ 28} The State moved the trial court to declare Mr. Reddick unavailable and admit his testimony from the first and second trials. The trial court deemed Mr. Reddick unavailable due to various unsuccessful efforts by the State to locate him for the third trial. The trial court reiterated its decision to exclude any testimony relative to Mr. Reddick's out-of-court identification of defendant. The trial court, however, determined that Mr. Reddick's prior in-court identifications of defendant had an independent basis of reliability and admitted the testimony in that limited regard.[2] *Page 10 
 {¶ 29} Next, the State offered the testimony of Carl Malone, who was, at times relevant, the sergeant for the City of South Euclid Police Department. He responded to the radio broadcast of a robbery at the South Euclid BP station on July 10, 2003. He received information that a smaller, gray vehicle was used during the commission of the crime. Near the scene, he observed a vehicle matching that description and followed it to an address on Hillview, where he proceeded to call in the address to dispatch. He observed a black male on the south side of the house. Sgt. Malone ran the plate and left the scene. Two days later, he returned to the residence at the request of Det. Ardonetto. He was not able to identify any individual that day.
 {¶ 30} On cross-examination, Sgt. Malone confirms that he possibly testified before that the broadcast described a silver Dodge Neon and that the car he followed was a silver Ford Escort. He spotted the car about two miles from the BP station minutes after the robbery. He could see a driver but could not tell the gender of the driver.
 {¶ 31} Det. Volek then testified as follows: He responded to the report of an aggravated robbery at the Lube Stop on Green Road on July 15, 2003. He took a Polaroid camera and the photo array prepared by Det. Ardonetto in connection with the July 10, 2003 robbery that occurred in the same area. At that time, Det. Volek had no idea who had been identified from that photo array as the suspect in the other robbery. *Page 11 
 {¶ 32} Both victims of the Lube Stop robbery, when viewing this photo array, separately and immediately identified defendant's photo as the person who robbed the store. Their identifications were made within 15 minutes of the incident.
 {¶ 33} Det. Volek did not attempt to fingerprint any items at the Lube Stop. He did not learn that defendant may have touched anything at the Lube Stop until the following day. In his experience, he has never had any success in obtaining an identifying fingerprint off of a cellular phone.
 {¶ 34} The State also presented the prior sworn testimony of Mr. Reddick. He was working at the Lube Stop on July 15, 2003. At closing time, he observed a man approaching the store and walked in through the bay door. The man confronted his manager, Mr. Bennett, with a gun and ordered Bennett to lay down. The gun was a small, silver automatic. Bennett gave the man the register key. The robber instructed Reddick to put the money in a bag, which he did.
 {¶ 35} Mr. Reddick stood next to the man and saw his face. The man told Reddick to go into the bathroom. The man then left. He called the police, who arrived within minutes.
 {¶ 36} Mr. Reddick made a written statement of the incident. He described the robber as a tall, black male, approximately 25, 30 years old. Reddick also indicated that the robber used a silver gun.
 {¶ 37} He made an in-court identification of defendant as the person who robbed the Lube Stop on July 15, 2003. Mr. Reddick further explained that he could *Page 12 
not identify the defendant in the first trial because he was not wearing his glasses at that time. "Now [that he had his] glasses on. [He was] very sure."
 {¶ 38} On cross-examination, Mr. Reddick confirmed that he previously described the robber as a black male about six feet tall, about 21 years of age. He also told the police that the robber opened the cash register. Mr. Reddick admitted that he did not mention in the first trial that he could not identify defendant due to forgetting his glasses. He did not say anything about his glasses at that time because he did not realize it was important.
 {¶ 39} The State then called Leneshia Page to testify. On July 10, 2003, she witnessed a robbery at the BP Station in South Euclid. She was in her vehicle when she saw a guy running from the stairway and begin attacking a woman. The man grabbed something from the victim, then jumped into the trunk of a car driven by a female. She described the man as an African American wearing a blue jacket. The man was slim, about five-foot-nine and "kind of dark skinned." She believed the car was a "Neon" and believed it was gray.
 {¶ 40} On cross-examination, Ms. Page stated she was absolutely sure that the vehicle was a Neon.
 {¶ 41} Lloyd Blankenship testified next on behalf of the State. He also witnessed the robbery that occurred at the South Euclid BP Station on July 10, 2003. While he was talking on the phone, he saw a man start "wrestling" with a woman. The man took something out of her hand and ran around the building. Blankenship *Page 13 
got out of his car and called 911. He described the man as being about six-two, a black male wearing a windbreaker. He believed the man's coat was red.
 {¶ 42} Blankenship met with Det. Ardonetto months after the incident. Det. Ardonetto asked him to select a person from the photo array. He selected photo numbers 1 and 5 from the array because they looked close to the person he thought committed the crime. The men in photos 1 and 5 resembled each other.
 {¶ 43} On cross-examination, Blankenship confirmed that he was not sure if either person he had identified was the person he saw on July 10, 2003. He also felt that the detective wanted him to identify someone from that photo array, so he did.
 {¶ 44} On re-direct, Blankenship denied that the detective had pressured him to make a decision on the photo array.
 {¶ 45} Det. Ardonetto was the last witness called by the State. He stated as follows: He investigated the July 10, 2003 robbery at the BP Station in South Euclid. He learned on July 12, 2003 that Sgt. Malone had followed a suspect to 1775 Hillview in Cleveland. He went to the address and observed a silver Ford Escort with a plate that matched the vehicle Sgt. Malone had followed on July 10, 2003. A black male came out of the garage and identified himself as Ramone Glover, the defendant. Defendant's girlfriend was also present at the scene.
 {¶ 46} Det. Ardonetto identified defendant as the man he observed at the Hillview residence. *Page 14 
 {¶ 47} Det. Ardonetto advised defendant and his girlfriend of their rights. Defendant said he had no knowledge of the Ford Escort that was parked outside. Det. Ardonetto photographed both defendant and his girlfriend.
 {¶ 48} Det. Ardonetto then prepared a photo array with defendant's picture, which was marked as State's Exhibit 1. He placed defendant's photo in position number 5 on the array.
 {¶ 49} Det. Ardonetto had put together at least 200 other photo arrays during his career. He utilizes "mug books, photographs and Polaroids" of persons previously arrested to prepare the array. He attempts to find others with similar features to that of the suspect.
 {¶ 50} He presented the photo array to the victim of the BP Station robbery the same day. Det. Ardonetto asked Ms. Pinkston if she could identify anyone from the array as the robber. Within five seconds, she selected defendant's photograph and said "That's him. * * * He's the one that robbed me. * * * Photo number five."
 {¶ 51} In his opinion, a Dodge Neon looks like a Ford Escort, both are compact cars and "very similar in appearance."
 {¶ 52} He later learned that there was an aggravated robbery on July 15, 2003 across the street at the Lube Stop. The victim of that crime also identified defendant as the robber. On August 4, 2003, he arrested defendant at the Hillview address.
 {¶ 53} On cross-examination, Det. Ardonetto said a female named Jennifer Suchy owned the Ford Escort that was found at the Hillview address. He also *Page 15 
acknowledged that the height and weight of the individuals in the array is not obvious. Det. Ardonetto also heard Ms. Pinkston comment to the prosecutor at one point that "number five looks most like him [the person who robbed her]."
 {¶ 54} The State rested and defendant motioned for acquittal. The court overruled defendant's motion. Defendant then reasserted his motion to sever, which the trial court again denied. The defense did not present any witnesses.
 {¶ 55} The jury found defendant guilty of robbery and aggravated robbery with firearm specifications.
 {¶ 56} At sentencing, the State requested that the trial court impose at least a nine-year prison sentence, which was the sentence defendant received following his second trial. The State, however, also suggested to the trial court "to perhaps consider an increase in the sentence as a result of hearing the testimony * * *." The victims did not appear for the sentencing.
 {¶ 57} Defendant continued to maintain his innocence and felt he could not say anything beyond that to the court.
 {¶ 58} Defense counsel reminded the trial court of the victim's acquiescence to defendant's early release from prison that was proposed prior to the trial. Counsel also stated that the same evidence was presented in this trial as in the previous two trials, which had yielded a nine-year sentence.
 {¶ 59} The trial court stated "I guess the only difference between the last sentence and this one is a different Judge looking at these facts. And I definitely *Page 16 
have a different opinion than the last Judge, so I'm going to go with my feelings." The Judge reasoned "I saw [Ms. Pinkston] sit up here and quiver and shake. She was obviously frightened, even made a comment at one point in her testimony about [defendant] staring at her during the trial and how that intimidated her and made her feel.
 {¶ 60} "And it was palpable in this courtroom. * * * she was seriously frightened, traumatized and — and victimized, and she had to relive it all again here.
 {¶ 61} "And this Court will not punish you for exercising your trial right. You have an absolute right to do that, * * *
 {¶ 62} "The nature of going to trial is that the Judge gets to hear firsthand from the victims exactly what went on and see how they reacted, see how it's affected them."
 {¶ 63} The trial court imposed a 12-year prison term, eight years on count one, concurrent to nine years on count two, and consecutive to a three-year mandatory term on the firearm specification. Defense counsel objected to the increased sentence.
 {¶ 64} Defendant now appeals, raising six assignments of error, which will be addressed in order.
 {¶ 65} "I. The trial court erred when it overruled appellant's motion to suppress the photo array and resulting identifications in both counts." *Page 17 
 {¶ 66} A reviewing court is bound to accept the trial court's findings of fact in ruling on a motion to suppress if the findings are supported by competent, credible evidence. State v. Klein (1991),73 Ohio App.3d 486. However, the reviewing court must independently determine, as a matter of law, without deference to the trial court's conclusion, whether the trial court's decision meets the appropriate legal standard.State v. Claytor (1993), 85 Ohio App.3d 623, 627.
 {¶ 67} The defendant bears the initial burden of establishing that the photographic identification procedure was unnecessarily suggestive. If the defendant meets this burden, the court must consider whether the procedure was so unduly suggestive as to give rise to irreparable mistaken identification. State v. Wills (1997), 120 Ohio App.3d 320,324-325, citing Manson v. Brathwaite (1977), 432 U.S. 98, 114; State v.Garner (1995), 74 Ohio St.3d 49, 61.
 {¶ 68} The court must determine whether the photographic identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."Simmons v. United States (1968) 390 U.S. 377, 384.
 {¶ 69} The Supreme Court instructs courts to consider the following factors with regard to potential misidentification: "the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the *Page 18 
confrontation * * *." Neil v. Biggers (1972), 409 U.S. 188, 199-200. The court must review these factors under the totality of the circumstances. Id. And, "although the identification procedure may have contained notable flaws, this factor does not, per se, preclude the admissibility of the identification." See State v. Browner, Scioto App. No. 99CA2688, 2001-Ohio-2518, citing State v. Merrill (1984), 22 Ohio App.3d 119, 121;State v. Moody (1978), 55 Ohio St.2d 64, 67.
 {¶ 70} Defendant argues the identification procedure was unnecessarily suggestive because the array consisted of "only six pictures" that were a "mix of Polaroid photos and 35 millimeter photos." There is no authority presented that these factors differ from typical photo arrays or that would support a finding of suggestiveness towards selecting defendant's photograph.
 {¶ 71} Defendant also believed the depiction of only two males with braids was unduly suggestive. None of the witnesses said that they relied on braided hair in making the identification. Most could not really recall specifics about the robber's hair.
 {¶ 72} Finally, defendant believed the photos contained in the array were defective by containing an inconsistent depiction of skin tone and facial hair. He believed only one photo, his, depicts a man with medium skin tone, with braids and a mustache. This, he concludes, left the victims with only one choice.
 {¶ 73} The testimony reveals that Mr. Bennett, the only admitted pre-trial eyewitness identification of the Lube Stop robber, was certain defendant was him. *Page 19 
Yet, his testimony waffled on skin tone, type of hair, and the presence of facial hair. Thus, we can only conclude that none of these features unduly swayed his decision to select defendant's picture.
 {¶ 74} Likewise, Ms. Pinkston's opinion was that there are only two skin tones — dark and light. She also was unsure of whether the robber had facial hair and thought he might have had braids. She did not claim to have utilized any of these features as the means of selecting defendant's photograph.
 {¶ 75} In addition, Mr. Bennett identified defendant as the robber within minutes of the incident and was always certain of his identification. Ms. Pinkston identified defendant within days of the occurrence. Both victims had an opportunity to view defendant for a period of time. All of these factors weigh in favor of the admission of the pre-trial identifications made by these witnesses and the trial court did not err in denying the motion to suppress them.
 {¶ 76} Lloyd Blankenship witnessed the BP robbery from a distance of approximately 50 feet. Months passed before he was presented with the photo array. While he denied that the detective "pressured" him, his testimony clearly illustrates that he felt compelled to identify someone. Instead of identifying a single photo, he picked the two that he felt looked most like the person he saw. Although we are inclined to find the circumstances of his identification to be unduly suggestive, the admission of it was harmless error. Crim. R. 52. *Page 20 
 {¶ 77} Blankenship told the jury his trepidations and even admitted that he was not sure that either person he identified had actually committed the offense. Even if his testimony was excluded, the jurors still had the testimony and eyewitness identification of defendant made by the actual victim of the BP robbery. Thus, the admission of Blankenship's testimony was harmless error.
 {¶ 78} Assignment of Error I is overruled.
 {¶ 79} "II. The trial court erred when it denied appellant's motion to sever the counts for trial."
 {¶ 80} Defendant previously raised and we previously rejected this assignment of error. (See Glover I).
 {¶ 81} The decision of a reviewing court in a case remains the law of that case on legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels. Nolan v. Nolan (1984),11 Ohio St.3d 1, 3. Accordingly, we overrule this assignment of error, which has been explicitly raised by defendant and rejected by this Court already. Id.
 {¶ 82} Assignment of Error II is overruled.
 {¶ 83} "III. The trial court erred when it declared Prentiss Reddick an unavailable witness."
 {¶ 84} Evid. R. 804(B)(1) provides:
 {¶ 85} "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: *Page 21 
 {¶ 86} "Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding * * * if the party against whom the testimony is now offered, * * * had an opportunity and similar motive to develop the testimony by direct, cross, or redirect testimony * * *."
 {¶ 87} The definition of unavailability is contained in Evid. R. 804(A). Evid. R. 804(A)(5) provides that a witness is unavailable if he/she "is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance * * * by process or other reasonable means."
 {¶ 88} A witness is unavailable if there is a good faith effort made to obtain the witness and there was an opportunity to cross-examine the witness. State v. Jester (1987), 32 Ohio St.3d 147.
 {¶ 89} Det. Ardonetto attempted to serve a subpoena at Mr. Reddick's last known address. He also stated that he looked for him at motels along Euclid Avenue without success. The record evidence indicates that Mr. Reddick was in failing health at the time of defendant's second trial and had just quit his long-time job at Lube Stop around that same time. The record sufficiently establishes that there were good faith efforts made to locate this witness.
 {¶ 90} The trial court limited Mr. Reddick's testimony and excluded any mention of his pretrial identification of defendant. Further, his testimony from both the first and second trial were marked as court's exhibits and made available to the defense. In both instances, defendant had a full and fair opportunity to cross- *Page 22 
examine Mr. Reddick; albeit via different defense counsel. Accordingly, the second factor required for admission of this evidence was also satisfied.
 {¶ 91} Assignment of Error III is overruled.
 {¶ 92} "IV. Appellant has been deprived of his liberty without due process of law by his convictions in both counts, which were not supported by sufficient evidence to prove his guilt beyond a reasonable doubt."
 {¶ 93} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. We must determine whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 94} Defendant believed his convictions were supported by insufficient evidence, due to the inconsistencies among the eyewitness identifications. Notwithstanding, construing the evidence in a light most favorable to the State, there was sufficient evidence to submit the case to the jury on both counts. Among the other evidence, Ms. Pinkston identified defendant as the person who robbed her on July 10, 2003 and Mr. Bennett identified defendant as the person who robbed the Lube Stop on July 15, 2003 with a gun. Accordingly, defendant's convictions were based on sufficient evidence. *Page 23 
 {¶ 95} Defendant further challenges the sufficiency of the evidence concerning the operability of the firearm.
 {¶ 96} The Ohio Supreme Court has held that "[a] firearm enhancement specification can be proven beyond a reasonable doubt by circumstantial evidence. In determining whether an individual was in possession of a firearm and whether the firearm was operable or capable of being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm." Id. at paragraph one of the syllabus; accord State v.Murphy (1990), 49 Ohio St.3d 206, ("The State must present evidence beyond a reasonable doubt that a firearm was operable at the time of the offense before a defendant can receive an enhanced penalty * * *. However, such proof can be established beyond a reasonable doubt by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime [State v. Gaines (1989),46 Ohio St.3d 65, 545 N.E.2d 68]"); see, also, State v. Tolbert, Cuyahoga App. No. 86246, 2006-Ohio-544, ¶¶ 26-29, State v. Jackson, Cuyahoga App. No. 86542, 2006-Ohio-1938, ¶¶ 24-27).
 {¶ 97} Both Bennett and Reddick testified that defendant had a silver handgun, that he pointed it at Bennett and that they were in fear.
 {¶ 98} This Court has recently noted: *Page 24 
 {¶ 99} "`[I]n Thompkins, supra, the Supreme Court of Ohio rejected the view that the circumstantial proof of operability must consist of certain recognized indicia, such as bullets, the smell of gunpowder, bullet holes, or verbal threats by the user of the weapon that he or she would shoot the victim." Id. at 382. The Thompkins court held that anything that looks like a gun and is brandished is "capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant." Id. at 383. Thus, operability or potential operability may be proven where an individual "brandishes a gun and implicitly but not expressly threatens to discharge the firearm at the time of the offense." Id. at 384.'" Tolbert, supra, ¶ 28.
 {¶ 100} As was the case in Tolbert, the gun was never recovered here. Nonetheless, the eyewitness' testimony was sufficient to prove that an operable firearm was used by defendant on July 15, 2003, in the Lube Stop offense.
 {¶ 101} Assignment of Error IV is overruled.
 {¶ 102} "V. Appellant's convictions for robbery as charged in Count One and aggravated robbery with firearm enhancement specifications as charged in Count Two were against the manifest weight of the evidence."
 {¶ 103} While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenge questions whether the State has met its burden of persuasion. State v. Thompkins, supra at 390. When a defendant asserts that her conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the *Page 25 
evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
 {¶ 104} Defendant again relies on the inconsistencies among the witnesses' testimony in describing the suspect robber to support his contention that the jury lost its way in convicting him.
 {¶ 105} The record evidence is summarized previously in this opinion. The jury clearly did not lose its way in resolving conflicts among the testimony. The convictions are supported by ample testimony and evidence in the record.
 {¶ 106} Assignment of Error v is overruled.
 {¶ 107} "VI. Appellant has been deprived of his liberty without due process of law when the trial court imposed a harsher sentence for his convictions after retrial."
 {¶ 108} This Court has set forth the law relevant to the resolution of this issue in State v. Chandler, Cuyahoga App. No. 83629, 2004-Ohio-2988
as follows:
 {¶ 109} "A trial court violates the Due Process Clause of the Fourteenth Amendment when it resentences a defendant to a harsher sentence when motivated by vindictive retaliation. North Carolina v.Pearce (1969), 395 U.S. 711, 724. A presumption of vindictiveness arises when the same judge resentences a defendant *Page 26 
to a harsher sentence following a successful appeal. Id. However, that presumption does not apply when the resentencing judge is different than the original sentencing judge. State v. Douse, Cuyahoga App. No. 82008,2003-Ohio-5238, citing State v. Gonzales, 151 Ohio App.3d 160,2002-Ohio-4937, ¶ 25; Lodi v. McMasters (1986), 31 Ohio App.3d 275,277."
 {¶ 110} When the sentencing judge on remand is different, there is no presumption of vindictiveness at resentencing. Id., citing State v.Johnson, Montgomery App. No. 18937, 2002-Ohio-4339.
 {¶ 111} "`Even though a presumption of vindictiveness does not apply, a defendant may nevertheless seek to demonstrate, from the record, that the harsher sentence is the product of judicial vindictiveness.'[Johnson, supra]" Id.
 {¶ 112} Here, defendant believes the trial court vindictively imposed a harsher sentence because defendant wanted a third jury trial. Defendant points to the trial court's pre-trial promise, with the police and victims' agreement, to grant him judicial release within months had he pled guilty to the indictment. Defendant also asserts that there were no "new facts" presented that were not made part of the previous records in the first and second trials.
 {¶ 113} The record includes the following comments made by the trial court prior to trial: *Page 27 
 {¶ 114} "I'm not making any promises as to what my sentence will be if the jury comes back guilty on all of these counts. It might be more thannine years. It might be less.
 {¶ 115} "I don't know the facts, but I am willing to accept this agreement [of imposing a six-year sentence], at least the recommendation of your attorney, without the objection of the State of Ohio * * *" (Tr. 18-19, emphasis added).
 {¶ 116} The trial court went on to explain to defendant at the pretrial proceedings as follows:
 {¶ 117} "So you have a potential of six years that you know about minus whatever you have already served or the potential worst case scenario of 21 years. All right? You have seen this case tried twice before.
 {¶ 118} "You have seen how jurors react * * * We'll have a trial as long as you understand those consequences." (Tr. 22).
 {¶ 119} The trial court also informed defendant as follows:
 {¶ 120} "If you want a trial, I will give you a trial. No problem with that, as long as you understand the opportunity that you are passing up and the potential worst case scenario consequences, if everything goes wrong for you and the jury comes back guilty and I look at all of the legal factors about how you should be sentenced, and the worst case scenario is 21 years." (Tr. 26). *Page 28 
 {¶ 121} At a subsequent pretrial, the trial court again explained, "if it went to the jury and you're convicted you're potentially looking at a sentence of eight years on count one, plus 13 years on count two in a worse case scenario, okay, that's 21 years total prison time, not saying that that's what the sentence would be if you're convicted. I'd have to hear all the testimony. I'd have to take everything into consideration, but if there was a trial and I heard the victim testifying about firearms and fear and all those factors that I would normally look into, you'd be risking that possibility of maximum consecutive sentence, not saying that'll happen, but that's a risk that you'd have to understand that you'd be taking." (Tr. 45).
 {¶ 122} Defendant decided not to accept the plea offer and went to trial.
 {¶ 123} At sentencing, the judge made the following comments:
 {¶ 124} "I guess the only difference between the last sentence and this one is a different Judge looking at these facts. And I definitely have a different opinion than the last Judge, so I'm going to go with my feelings." The judge reasoned "I saw [Ms. Pinkston] sit up here and quiver and shake. She was obviously frightened, even made a comment at one point in her testimony about [defendant] staring at her during the trial and how that intimidated her and made her feel.
 {¶ 125} "And it was palpable in this courtroom. * * * she was seriously frightened, traumatized and — and victimized, and she had to relive it all again here. *Page 29 
 {¶ 126} "And this Court will not punish you for exercising your trial right. You have an absolute right to do that, * * *
 {¶ 127} "The nature of going to trial is that the Judge gets to hear firsthand from the victims exactly what went on and see how they reacted, see how it's affected them."
 {¶ 128} Following his third trial, defendant received a harsher sentence by three years. The record, as quoted above, does not substantiate that this increase in sentencing was the result of judicial vindictiveness. Rather, the trial court painstakingly detailed defendant's potential exposure to a 21-year sentence during the plea negotiations. The trial judge advised that notwithstanding his inclination to go along with the proposed plea agreement, he was not promising any specific sentence.
 {¶ 129} After completion of the trial, the trial judge explained his reasons for imposing a greater sentence, including the demeanor of the witnesses. There is nothing beyond the mere fact of a greater sentence that would support a finding of vindictiveness in sentencing. That standing alone is not enough to merit reversal in light of the trial court's stated reasons for imposing a harsher sentence.
 {¶ 130} Assignment of Error VI is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant its costs herein taxed.
 The court finds there were reasonable grounds for this appeal. *Page 30 
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MELODY J. STEWART, J., and MARY J. BOYLE, J., CONCUR
[1] Mr. Reddick was also a victim of the Lube Stop robbery; however, neither party subpoenaed him and the State was unable to locate him for defendant's third trial in this case.
[2] Reddick's testimony from the first trial is Court's Exhibit 2. Reddick's testimony from the second trial is Court's Exhibit 1. *Page 1